EDITH M. STERN, as Administratrix of the Estate of
PHILIP H. STERN, Deceased, Respondent, *v.* INTERNA-
TIONAL RAILWAY COMPANY et al., Appellants.

Street railroads — nuisance — negligence — dangerous location
of trolley poles — when maintenance of trolley poles in center of
street between railway tracks constitutes a nuisance for which
railroad company is liable — when city liable — collision of motor
car with one of such trolley poles — when person injured thereby
may recover damages against the city and the railroad company
as well as the owner of the motor car.

1. The rights of a railroad corporation upon the parts of the
streets appropriated to its use must be so exercised that the free
use of the streets, for the purposes and in the modes inherent in
their creation, will not be unreasonably interfered with. It is a
part of the regulative power of the local authorities to secure such
result. (*People ex rel. City of New York* v. *N. Y. Railways Co.*,
217 N. Y. 310, 317, distinguished.)

2. A city may not excuse itself from a charge of negligence as to
the condition and care of its streets, merely by claiming that it acted
judicially in determining to leave the street in a dangerous condi-
tion for public travel. Trolley poles in a street are not a municipal
improvement where they are not planned and placed by the city
but by the railway. If their location is dangerous, and the danger
is needless, they violate the implied condition of the franchise, and
are in the highway without right, and the city can compel their
removal even though considered safe when first erected.

3. If the place chosen by a street railway for the location of its
poles is so dangerous and the danger so needless that the choice
becomes unreasonable, both the railway company and the city are
charged with liability in case of injury resulting therefrom. The
railway company is liable, because the poles are then a nuisance.
The city is liable, because the nuisance is not abated.

4. Plaintiff brings this action for the damages suffered through
the death of her husband in an automobile collision which occurred
in Main street in the city of Buffalo. The car in which plaintiff
was riding, belonging to the defendant, the motor car company,
was so negligently driven by its salesman and general manager
that it collided with a trolley pole in the center of the highway.
Judgment has gone against that company, on the ground that it

is chargeable with the negligence of its servant, and against the railway company and the city on the ground that the trolley poles were unreasonable and dangerous obstructions. The tracks of the railway company run at this point through the center of the street. Authority to lay them was granted by the legislature in 1866. The common council did not prescribe the location of the poles when the road was electrified some years after, and the railway company placed them at the center of the street in the space between its double tracks, without the protection of curbstones or other guards. Although the council required the removal of the center trolley poles in other sections of Main street, in the district where the collision occurred no such change has ever been ordered and none has been made. *Held*, that the trial judge properly instructed the jury that the railway company and the city were liable if the poles located in the center of the street were unreasonable and dangerous obstructions of the highway.

*Stern* v. *International Ry. Co.*, 167 App. Div. 503, affirmed.

(Argued November 28, 1916; re-argued January 29, 1917; decided March 6, 1917.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 3, 1915, affirming a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Porter Norton* for International Railway Company, appellant. The consent of the local authorities to the construction and maintenance of a railroad and the structures to operate the same in the center of the streets, presumed under the Railroad Law to have been given to defendant railway company, became part of its indivisible franchise as if given directly by the legislature. (*B. S. & F. F. R. Co.* v. *City of New York*, 140 App. Div. 611; *Matter of S. & M. S. R. Co.*, 171 N. Y. 589; *B. H. R. R. Co.* v. *City of Brooklyn*, 152 N. Y. 244; *McCruden* v. *Rochester R. Co.*, 5 Misc. Rep. 59; 152 N. Y. 623; *People ex rel.* v. *N. Y. Railways Co.*, 217 N. Y. 310.) The location of the trolley poles in the cen-

ter of Main street was within the statutory power and authority of the common council to adopt, and the presumption being that it did adopt such location lawfully, there could be no charge of nuisance founded upon such location. (*People ex rel.* v. *N. Y. Railways Co.*, 217 N. Y. 310; *McCruden* v. *Rochester R. Co.*, 5 Misc. Rep. 59; 77 Hun, 609; 152 N. Y. 623; *Hollis* v. *B. H. R. R. Co.*, 128 App. Div. 821.) The defendant railway company was guilty of no negligence in the maintenance of its center pole line. (2 Abb. on Mun. Corp. § 829; Dillon on Mun. Corp. [5th ed.] § 1128; *Lambert* v. *W. Ry. Co.*, 191 N. Y. 248.)

*William S. Rann*, Corporation Counsel (*George E. Pierce* of counsel), for City of Buffalo, appellant. The construction and operation of the street railway in Main street was authorized and was not a nuisance. (*Babbage* v. *Powers*, 130 N. Y. 281; *Jorgensen* v. *Squires*, 144 N. Y. 280; *Hollis* v. *B. H. R. R. Co.*, 128 App. Div. 821.) The legislature of the state having granted authority to operate a street railroad in Main street, and the local authorities and property owners having consented to the change of motive power and the location of the poles, the defendant city is not liable in an action for damages arising by reason of such construction and operation of the railroad. (*Urquhart* v. *City of Ogdensburg*, 91 N. Y. 67; *Owen* v. *City of New York*, 141 App. Div. 217; *Pitman* v. *City of New York*, 141 App. Div. 670; *Gains* v. *City of New York*, 156 App. Div. 789; 215 N. Y. 533; *Fitch* v. *Mayor*, etc., 23 J. & S. 494; 119 N. Y. 608.) The street railway, between Cold Springs and Scajaquada creek, was lawfully built and the city could not compel a change in the location or manner of construction. (*McCruden* v. *R. Ry. Co.*, 5 Misc. Rep. 59; 151 N. Y. 623; *People ex rel. City of New York* v. *N. Y. R. Co.*, 217 N. Y. 310; *People ex rel. City of Olean* v. *W. N. Y. & P. Traction Co.*, 214 N. Y. 528.)

*Clinton B. Gibbs* for Windsor Motor Car Company, appellant. There is not any evidence which upon any reasonable view will sustain the verdict that Fairman, the driver of the automobile, was engaged in the business of the defendant Windsor Motor Car Company at the time of the accident. (*Salisbury ·v. E. R. R. Co.*, 66 N. J. L. 117; *Clark* v. *Buckmobile Co.*, 107 App. Div. 120; *Stewart* v. *Baruch*, 103 App. Div. 577; *Douglass* v. *Hewson*, 127 N. Y. Supp. 220; *Parsons* v. *Wisner*, 113 N. Y. Supp. 922; *Patterson* v. *Kates*, 152 Fed. Rep. 481; *Evers* v: *Kronge*, 70 N. J. L. 653; *Lewis* v. *Amorous*, 3 Ga. App. 50; *Friebaum* v. *Brady*, 143 App. Div. 220.)

*Thomas A. Sullivan* for respondent. Upon the evidence in this case the jury were fully warranted in finding as a matter of fact that the maintenance of the center poles in Main street by the appellant International Railway Company was an unreasonable use of said street and that these center poles were a dangerous and unnecessary obstruction to public traffic and that the appellant International Railway Company was negligent in failing to remove them. (*People ex rel. City of New York* v. *N. Y. Rys. Co.*, 217 N. Y. 310; *Potter* v. *Collis*, 156 N. Y. 16; *Wager* v. *Troy Union R. R. Co.*, 25 N. Y. 526; *Matter of Rapid Transit R. R. Comrs.*, 191 N. Y. 81; *Davis* v. *Mayor, etc., of N. Y.*, 14 N. Y. 506; *D., L. & W. R. R. Co.* v. *City of Buffalo*, 158 N. Y. 266; *Brooklyn Heights R. R. Co.* v. *Steers*, 213 N. Y. 76; *Lincoln Safe Deposit Co.* v. *City of New York*, 210 N. Y. 34; *Powers* v. *Village of Mechanicville*, 163 App. Div. 138; *Bloss* v. *Oneida Ry. Co.*, 162 App. Div. 200; *Caruso* v. *Troy Gas Co.*, 153 App. Div. 431; 209 N. Y. 510.) Although the defendant had authority to place trolley poles somewhere in the street, it is still liable for injury that results from its use of the highway, not because it has interfered with the highway without authority, but because it has not exercised its authority in a reasonable

manner.    (*Brown* v. *Met. Ry. Co.*, 60 App. Div. 184; 171 N. Y. 699; *Lambert* v. *W. C. El. Ry. Co.*, 191 N. Y. 248; *B. H. R. R. Co.* v. *Steers*, 213 N. Y. 76; *Clifford* v. *Dam*, 81 N. Y. 52; *Powers* v. *Mechanicville*, 163 App. Div. 138; *Bloss* v. *Oneida Ry. Co.*, 162 App. Div. 200; *Wooster* v. *F. S. S. Ry. Co.*, 50 N. Y. 205; *Sweet* v. *Perkins*, 196 N. Y. 482; *Driggs* v. *Phillips*, 103 N. Y. 77; *St. Vincent's Orphan Asylum* v. *City of Troy*, 76 N. Y. 114; *People ex rel. Wooster* v. *Maher*, 141 N. Y. 330; *Deshong* v. *City of New York*, 176 N. Y. 475; *D., L. & W. R. R. Co.* v. *City of Buffalo*, 158 N. Y. 272-274.) The jury were fully authorized in finding that the city of Buffalo was negligent in failing to cause the removal of the center poles from Main street.    (*People ex rel. City of New York* v. *New York Railways Co.*, 217 N. Y. 310; *Bloss* v. *Oneida Ry. Co.*, 162 App. Div. 200; *Caruso* v. *Troy Gas Co.*, 153 App. Div. 431; 209 N. Y. 510; *Barrett* v. *L. O. B. Imp. Co.*, 174 N. Y. 316; *Cohen* v. *Mayor, etc.*, 113 N. Y. 532; *Frank* v. *Village of Warsaw*, 198 N. Y. 463; *City of New York* v. *Rice*, 198 N. Y. 128; *Berger* v. *Solvay*, 156 App. Div. 440; *Wells* v. *City of Brooklyn*, 9 App. Div. 61; 158 N. Y. 699; 145 App. Div. 623; 21 App. Div. 625; 162 N. Y. 657; *Powers* v. *Mechanicville*, 163 App. Div. 137.)    The findings of the jury that Fairman was prosecuting the business of the defendant Windsor Motor Car Company, and acting within the scope of his authority in inviting the deceased and others for a ride in the Kline automobile on the evening of the accident, was amply supported by the evidence. (*McCann* v. *Davison*, 130 N. Y. Supp. 475; *Ferris* v. *Sterling*, 214 N. Y. 249; *Cosgrove* v. *Ogden*, 49 N. Y. 255; *Peck* v. *N. Y. C. R. R. Co.*, 70 N. Y. 787; *Higgins* v. *Turnpike Co.*, 46 N. Y. 23; *Rounds* v. *D., L. & W. R. R. Co.*, 64 N. Y. 129; *Ochsenbein* v. *Shapley*, 85 N. Y. 214; *Quinn* v. *Powers*, 87 N. Y. 535; *Kartner* v. *L. I. Ry. Co.*, 76 App. Div. 323; *Mott* v. *Ice Co.*, 73 N. Y. 543; *Burns* v. *Ry. Co.*, 4 App. Div. 426.)

CARDOZO, J.   The plaintiff, as administratrix of the estate of her husband, brings this action for the damages suffered through his death.   She has obtained a judgment against three defendants, the International Railway Company, the city of Buffalo and the Windsor Motor Car Company.   Her husband met his death in an automobile collision.   The car in which he was riding belonged to the Windsor Motor Car Company, and was driven by one Fairman, its salesman and general manager.   There is evidence that Fairman was driving negligently.   He attempted to pass a car ahead of him, but gave no warning of his approach.   The car ahead moved out into his path to pass a heavy mail wagon in front of it. To avoid collision Fairman swung his own car sharply to the left, and it collided with a trolley pole in the centre of the highway.   Judgment has gone against the Windsor Motor Car Company on the ground that it is chargeable with the negligence of its servant.   Judgment has gone against the International Railway Company and the city of Buffalo on the ground that the trolley poles were unreasonable and dangerous obstructions.

The collision occurred in Main street near its intersection with Florida street in the city of Buffalo.   Main street in that neighborhood has a width of one hundred feet. Each sidewalk is twenty-five feet wide, and there is a space of fifty feet from curb to curb.   The tracks of the International Railway Company, the successor of the Buffalo Street Railway Company, run through the centre of the street.   Authority to lay them was granted by the legislature in 1866 (L. 1866, ch. 479).   At first the cars were drawn by horses, but for many years the motive power has been electricity.   A change of power was first authorized by the common council in 1889.   The consent granted at that time affected that part of Main street between Cold Springs and Scajaquada creek, which includes the scene of this collision.   The council did not prescribe the location of the poles, and the railway com-

pany placed them at the centre of the street in the space
between its double tracks. The poles stand at intervals
of one hundred and twenty-five feet. They are without
the protection of curbstones or other guards. About the
same time there was a like change of power in other streets
and districts. A change was authorized in Niagara
street in 1890. In that street the resolution of the com-
mon council imposes as a condition the use of centre poles
unless the side pole construction is preferred by the abut-
ting owners. In 1891 a change was authorized in another
section of Main street, a section between Michigan and
Ohio streets, south of the Cold Springs district. There
the council required the side pole construction, unless the
centre poles were preferred by the abutting owners. By
that time centre poles had already been installed in the
Cold Springs district, the scene of the collision, and they
remained there without objection. The first suggestion
of danger came in 1909. In December of that year a
resolution was adopted by the council requiring the rail-
way company to remove the "centre trolley poles now
remaining in Main street between the Erie Railroad and
City line, the same being dangerous to traffic in said
street," and in February, 1912, a resolution similar in
form required the removal of centre poles between the
New York Central Belt line and the Erie railroad.
Those parts of Main street are south of the scene of the
collision. They are given over almost exclusively to
business. Main street, where the collision occurred, is
chiefly a residence district. In that district no change of
the location of the poles has ever been ordered by the
council, and none has been made. The trial judge told
the jury that the railway company and the city were
liable if poles located in the centre of the street were
unreasonable and dangerous obstructions of the highway.
Whether that ruling may be sustained is the first ques-
tion to be determined.

The railway company had the right with the consent of

the common council and the property owners to electrify
its road (L. 1884, ch. 252, § 12). The consent of the
council was obtained. The consent of the property own-
ers, after all these years of acquiescence, must be pre-
sumed (Railroad Law, § 171). The poles, if placed and
maintained with due regard for the public safety, are
not unlawful obstructions. They are obstructions inci-
dental to the exercise of a statutory right. The statute
has not said, however, where the poles shall be located.
The implied condition is, therefore, attached that they
must be so located as to avoid unreasonable and unneces-
sary danger to travelers upon the highway (*Cleveland* v.
*Bangor Street Ry. Co.*, 86 Maine, 232; *McKim* v. *Phila-
delphia*, 217 Penn. St. 243; *Lambert* v. *Westchester El.
R. R. Co.*, 191 N. Y. 248, 252; *Hill* v. *Mayor, etc., of
N. Y.*, 139 N. Y. 495; *D., L. & W. R. R. Co.* v. *Buf-
falo*, 158 N. Y. 266; *Morton* v. *Mayor, etc., of New
York*, 140 N. Y. 207; *Trustees Village of Canandaigua*
v. *Foster*, 156 N. Y. 354, 359; *Brown* v. *Met. St. Ry.
Co.*, 60 App. Div. 184, 186; 171 N. Y. 699; 21 Halsbury,
Laws of England, title Nuisance, p. 520). Subject to
that condition, the railway company, in the absence of
express command by the municipal authorities, may
place them where it will. In this part of Main street the
city gave no command. The railway company was,
therefore, free to make its own choice if the choice was
not unreasonable. Freedom of selection it had, but not
freedom without limits. We do not mean to say that
to make out a breach of duty, it is enough to show that
there was an error of judgment (*Seibert* v. *Mo. Pac.
Ry. Co.*, 188 Mo. 657). The question is not whether
some other place is better. The question is whether the
place chosen is so dangerous and the danger so needless
that the choice becomes unreasonable. If danger in that
degree is present, both the railway company and the city
are charged with liability. The railway company is
liable, because the poles are then a nuisance (*Lambert* v.

*Westchester El. R. R. Co., supra; Cleveland* v. *Bangor Street Ry. Co., supra*). The city is liable because the nuisance is not abated (*McKim* v. *Philadelphia, supra; Ring* v. *City of Cohoes*, 77 N. Y. 83, 88).

The question, therefore, is whether there is any evidence that in April, 1912, when the accident occurred, the location of these poles was dangerous, and that the danger was unreasonable. When the road was first electrified in 1889, there were, comparatively speaking, but few trolley lines in this state. We may assume without deciding that the choice of centre poles rather than side poles, even though unwise, was, in those conditions and at that time, an error of judgment and no more. But in the years that have followed conditions have changed. The use of trolleys has become almost universal; the centre poles have been supplanted generally, though not everywhere, by side poles, placed upon the sidewalk; the automobile has changed the ancient modes of travel, and magnified the likelihood and dangers of collision. We think the jury had the right to find that with these changes the centre poles have become a menace to the traveler. That they were a menace in other parts of Main street the common council had itself resolved. It announced that judgment in 1909 and again in 1912. In each year the railway company received the resolution, and obeyed it. We do not overlook the suggestion that there was a difference of conditions. Main street at the points of change was narrower, it is said, than at the scene of the collision. Its width was forty feet instead of fifty. At the time of the resolutions, however, an order had been made to widen it. Evidently the centre poles were still felt to be a source of danger. There was also a difference, it is said, in the character of the neighborhood. One section was devoted to business; the other in the main to residences. But even in the residence section business had gained a foothold. We think that conditions, even though not identical, were similar to such an

extent as to make the change of some significance. But aside from any admission implied in the defendant's conduct, the very location of the poles gives room for conflicting inferences. Plainly, there was at least some risk of accident; plainly, the risk was needless, whatever its degree; plainly, therefore, the inference of fault may be drawn unless the risk was so remote or trifling that reasonable men in the exercise of reasonable care would not have striven to avoid it. In the light of all the circumstances, we think that question was for the jury. We have the express admission of the city, three years before the accident, that in another section of the same street the poles had become a danger to public traffic. We have the railway's submission to the order, which found its justification in the danger (Wigmore on Ev. § 282; *Stevens* v. *Boston El. R. Co.*, 184 Mass. 476, 478; *C. & A. R. R. Co.* v. *Eaton*, 194 Ill. 441). We have the general disuse of centre poles in other cities, except where grassplots or other spaces in the centre of the street serve to subdivide the highway. And finally we have the growth in traffic during twenty years, the change in methods of locomotion, the added chances and dangers of collision, and the need, obvious without evidence, of freeing the space between curb and curb from obstructions which could be made without risk to serve their purpose elsewhere. We place our judgment, not on any of these circumstances singly, but on all of them collectively. Their cumulative weight, we think, makes possible the inference that the centre poles had become dangerous, and that the danger was unreasonable. That the city had no record in its claims department of any similar collision is not decisive. It was none the less alive to the danger. This is attested by the resolution of its common council. Whether claims had been made against the railway company, we do not know. It gave no evidence on the subject, and neither gains nor loses by its silence.

The defendants refer to cases in which a city planning an improvement has been held to be exonerated for errors of judgment in the plan (*Urquhart* v. *City of Ogdensburg*, 91 N. Y. 67; 97 N. Y. 238; *Owen* v. *City of New York*, 141 App. Div. 217; *Pitman* v. *City of New York*, 141 App. Div. 670). A distinction has been drawn between affirmative approval, which will evidence a true exercise of discretion, and passive acquiescence, which may be merely a negligent omission to remedy an evil. The decision in *Urquhart* v. *City of Ogdensburg*, on its second hearing in this court, illustrates the distinction (97 N. Y. 238). Even in cases of express approval, the rule of exemption has been kept by later cases within narrow bounds (*Ivory* v. *Town of Deerpark*, 116 N. Y. 476; *Fitzgerald* v. *City of Binghamton*, 40 Hun, 332; 111 N. Y. 686; *Nicholson* v. *Town of Stillwater*, 208 N. Y. 203; *Corcoran* v. *City of New York*, 188 N. Y. 131; *Kiernan* v. *Mayor, etc., of N. Y.*, 14 App. Div. 156, and cases there cited). We do not need to define them now. It is enough that the present case is not within them. These poles were not a municipal improvement. They were not planned and placed by the city. They were planned and placed by the railway. If their location was dangerous, and the danger was needless, they violated the implied condition of the franchise, and were in the highway without right. They were no more a municipal improvement than defective rails or slots (*Schild* v. *C. P., N. & E. R. R. R. Co.*, 133 N. Y. 446; *Brown* v. *Met. St. Ry. Co.*, 60 App. Div. 184; 171 N. Y. 699; *Worster* v. *42nd Street & G. St. F. R. R. Co.*, 50 N. Y. 203). The municipal improvement was the street, which had long ago been opened. While it remained open, the duty of the city was to see that it was kept clear of dangerous and unnecessary obstructions which with reasonable care could be discovered and avoided. Error of judgment alone does not carry liability with it, for error of judgment alone is consistent with reasonable care. But fail-

ure to abate dangers which reasonable care would have revealed, will charge the city with liability, and this whether the form of action be negligence or nuisance (*Trustees of Canandaigua* v. *Foster*, 156 N. Y. 354; *Uggla* v. *Brokaw*, 117 App. Div. 586, 591). " It cannot be held as a general proposition that a city may excuse itself from a charge of negligence as to the condition and care of its streets, merely by claiming that it acted judicially in determining to leave the street in a dangerous condition for public travel" (WILLIAMS, J., in *Kiernan* v. *Mayor, etc., of N. Y.,* 14 App. Div. 156, 159).

Reliance is placed upon rulings that stepping stones, hitching posts, hydrants, shade trees and the like are legitimate obstructions (*Robert* v. *Powell,* 168 N. Y. 411; *Dubois* v. *City of Kingston,* 102 N. Y. 219; *Wolff* v. *Dist. of Columbia,* 196 U. S. 152; *Ring* v. *City of Cohoes,* 77 N. Y. 83; *Dougherty* v. *Village of Horseheads,* 159 N. Y. 154; *Jordan* v. *City of New York,* 44 App. Div. 149; 165 N. Y. 657; *City of Wellington* v. *Gregson,* 31 Kansas, 99, 103; approved in 159 N. Y. 154, at 161). In some cases, as BREWER, J., points out in *City of Wellington* v. *Gregson (supra),* the courts dealt with the question as one of fact for a jury (citing 2 Dillon on Mun. Corp. § 1016). In other cases, exhibiting other conditions, they dealt with it as one of law. Always, however, the ruling was made, not absolutely, but relatively to particular conditions of location, of convenience or of necessity. We had occasion in *Lambert* v. *Westchester El. R. R. Co.* (191 N. Y. 248, 252) to emphasize that truth. There the cases that deal with stepping stones and the like were cited to exempt a street railroad from liability for so placing one of its trolley poles as to imperil the use of the highway. We put aside the citations as inapplicable, and held that the defendant's franchise did not authorize it to place its poles where they would "unduly and unnecessarily interfere" with the public right of travel (191 N. Y. at 252).

The point is made that if the centre poles were safe when first erected, the city could not compel them to be moved, though they later became dangerous. We are referred to our decision in *People ex rel. City of New York* v. *N. Y. Railways Co.* (217 N. Y. 310, 317), but we think it is inapplicable. There the attempt was made to compel a relocation of the tracks; and the location of the tracks was held to be of the substance of the franchise. The state might relocate them in the exercise of the police power, but not the municipality. Here the things to be moved are mere incidents or appurtenances; they do not affect the location of the right of way; and wherever they are placed, the franchise in its substance remains intact. This was recognized in *People ex rel. City of New York* v. *N. Y. Railways Co.* (*supra*). Judge COLLIN said: "The rights of a railroad corporation upon the parts of the streets appropriated to its use must be so exercised that the free use of the streets, for the purposes and in the modes inherent in their creation, will not be unreasonably interfered with. It is a part of the regulative power of the local authorities to secure such result."

The appeal of the Motor Car Company brings up the question whether Fairman, the driver of the car, was using it at the time of the accident in the business of his employer. As to that, enough was shown to make a question for the jury.

The judgment should be affirmed with costs.

COLLIN, J. (concurring in result). The burden was upon the defendants railway company and city to show that the poles were in the traveled part of the street by virtue of legislative authority, directly or representatively given. Proof tending to so show was not produced. Authority was not expressly given. Authority to electrify was not in any measure authority to so appropriate the streets by placing the poles in them, because there was not proof

that in 1884, or thereabouts, it was reasonably necessary, or within the legislative knowledge or intention or within judicial notice it was deemed reasonably necessary, that for the purpose of electrification the poles should be placed as they were. There is no proof that such placing could have been deemed reasonably essential to the electrification. Therefore, there was not given the authority expressly or through necessary implication to so place them. Acquiescence on the part of the state or municipal authorities did not constitute or operate as the authority. Under the power to electrify, in the absence of any consent or direction on the part of the state locating the poles, the railway company, irrespective of any statute or ordinance so providing, was bound, as a matter of law, to so place the poles that the use of the street by the public should not be unnecessarily impaired or rendered dangerous. Its duty was, not to do that within the street which was most advantageous to itself and its patrons, but in so far as was practicable and consistent with its use of electricity as a motive power, to refrain from obstructing the street or affecting or interfering with the free, safe and untrammeled public passage and traffic. This follows necessarily from the nature and purposes of our public highways. The record presents no evidence, and we may take judicial notice that it is not the fact, that in 1889, or at any subsequent time, in the street railroad world or with engineers or men of common affairs, it was deemed impracticable or inconsistent with proper and effective electrification to place the poles without the part of the highway appropriated by the traveling public and where, obviously and manifestly to common observation and intelligence, they would in a very substantial and important degree affect the ordinary and paramount use of the highway less than when placed within its traveled part. There was no evidence in the record tending to show that the appropriation of the street in part by the poles was authorized directly or through necessary

implication. The appropriation was at all times without authority or right and the poles were, as a matter of law, a public nuisance.

I dissent from that part of the opinion of Judge CARDOZO which suggests that the original placing of the poles was a mere error of judgment on the part of the railway company. The railway company had not the right, through any fact or rule of law, to render unsafe or inconvenient the use of the street for street purposes, except as actually required by practicable electrification. It is not in conformity with common sense or common knowledge to assume or presume that poles standing exactly and fully in the traveled part of the street affect its safety and utility no more than they would standing between the curbing and the sidewalk.

I dissent also from that part of the opinion of Judge CARDOZO which suggests that in case the poles had been originally placed where they were, with authority and right, changing conditions might have converted them into nuisances or negligent obstructions, although the authority or right had been in no wise withdrawn or annulled. I think that if the state had expressly or through necessary implication authorized the poles to be placed as they were, the authority would have remained forceful and valid until the state, by some action, rescinded or annulled it.

I vote for affirmance, for the reasons stated.

HISCOCK, Ch. J., CHASE, HOGAN and CRANE, JJ., concur with CARDOZO, J., and COLLIN, J., concurs in result in opinion; CUDDEBACK, J., takes no part.

Judgment affirmed.