THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE CITY OF NEW YORK, Respondent, *v.* BELT LINE RAILWAY CORPORATION, Appellant.

First Department, July 9, 1920.

**Municipal corporations — city of New York — when city cannot compel street railroad to relocate structures at its own expense on new grade — improvement of street without proceeding to change grade.**

Where a street railroad company in the city of New York, pursuant to authorization by the Board of Railroad Commissioners, laid its tracks and electrical equipment on street grades approved by said Commissioners, the city when improving said street without a proceeding to change its grade, cannot compel the railroad to relocate its permanent structures at its own expense at a higher and different grade, and mandamus will not issue to compel such action by the railroad company.

In the absence of direct legislative authority the city of New York is unauthorized to compel the relocation of tracks at the expense of a railroad company and there is no direct delegation of such police power of the State to said city.

DOWLING, J., dissents, with opinion.

APPEAL by the defendant, Belt Line Railway Corporation, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 11th day of February, 1920, granting relator's motion for a peremptory writ of mandamus.

The opinion of the Special Term is reported *sub nom. Matter of City of New York* v. *Belt Line R. Corp.* (110 Misc. Rep. 347).

*Addison B. Scoville* of counsel [*Alfred T. Davison,* attorney], for the appellant.

*Henry J. Shields* of counsel [*John P. O'Brien, Corporation Counsel,* attorney], for the respondent.

CLARKE, P. J.:

The defendant's tracks on Fifty-ninth street, laid upon the authorized grade of the street and built upon a permanent underground structure of steel and concrete, were established and have been maintained ever since 1897, at the grade then fixed by the then city authorities under express delegated authority from the State. The Board of Railroad Commissioners on application issued its certificate authorizing the conversion of the company's railroad from a horse railroad to an electric railroad operated by an underground current of electricity. Pursuant to the provisions of said certificate the railroad and the then commissioner of highways entered into an agreement providing for the manner of construction of said electric railroad to be so converted to electricity and in the permission given by the then commissioner of highways it was stipulated that the tracks should be laid on the lines and grades approved by the said commissioner and that the grade of the pavement between the rails and the slot should be such as should be prescribed by the commissioner and should be determined upon as part of the plans for construction when the same were approved. Thereafter the said underground railway structure and the tram rails thereon were constructed on the lines and grades approved and prescribed by the then commissioner of highways and the same has ever since been and now is maintained at such grade. The grade at Fifty-ninth street between Sixth avenue and Columbus Circle has not been changed since the converting of said horse railroad to an electric railroad and no proceeding to change such grade is now pending, and the present grade of the tram rails of the tracks thereon conform to the present grade of the street as so paved.

While it is true that in *People ex rel. City of Geneva* v. *G., W., etc., Traction Co.* (112 App. Div. 581; affd., 186 N. Y. 516) it was held that under the direct statutory authority conferred by the Legislature upon the city of Geneva by section 65 of its charter (Laws of 1897, chap. 360, as amd. by Laws of 1905, chap. 462) the city was authorized to require the relocating of the railroad at the expense of the railroad corporation, in *People ex rel. City of Olean* v. *W. N. Y. & P. T. Co.* (214 N. Y. 527) and in *People ex rel. City of New York* v.

94   People ex rel. City of N. Y. *v.* Belt Line Ry. Corp.

First Department, July, 1920.        [Vol. 193.

*New York Railways Co.* (217 id. 310) and in *City of New York* v. *Hudson & Manhattan R. R. Co.* (188 App. Div. 294; affd., 229 N. Y. 141), it was held that in the absence of direct legislative authority the city was unauthorized to compel the relocation of tracks at the expense of the railroad company. I find no such direct delegation of the police power of the State to the city of New York and am, therefore, of the opinion upon the record before us, that mandamus will not lie to compel at considerable expense to the defendant the relocation of its permanent and substantial structure built under the certificate of the Railroad Commissioners and in agreement with the city authorities upon the plans and at the grade then established.

In my opinion the order granting the peremptory writ should be reversed, with ten dollars costs and disbursements, and the motion denied, with fifty dollars costs.

Smith, Page and Greenbaum, JJ., concur; Dowling, J., dissents.

Dowling, J. (dissenting):

Defendant is a domestic street railroad corporation, owning and operating a railroad with double tracks on West Fifty-ninth street, between Fifth and Eighth avenues, in the borough of Manhattan, city of New York. It is the owner of the property and franchises formerly belonging to the Central Park, North and East River Railroad Company, which was organized under chapter 140 of the Laws of 1850, and acquired all the rights and franchises granted to individuals under chapter 511 of the Laws of 1860, authorizing the construction and operation of a street railroad, either double or single track, on Fifty-ninth street between First and Tenth avenues in the city of New York.

On or about March 18, 1897, the Board of Railroad Commissioners of the State of New York, on application of the Central Park, North and East River Railroad Company, issued its certificate authorizing the converting of said company's railroad from a horse railroad to an electric railroad operated by an underground current of electricity.

Thereafter, pursuant to the provisions of the above certificate of the Board of Railroad Commissioners, the Central

Park, North and East River Railroad Company and its then lessor, Metropolitan Street Railway Company, entered into an agreement with the then commissioner of highways of the city of New York, providing for the manner of construction of said electric railroad on the streets and avenues then occupied by the horse railroad of the said Central Park, North and East River Railroad Company, to be so converted to electricity including said railroad on Fifty-ninth street, borough of Manhattan, between First and Tenth avenues, and in the permission given by the then commissioner of highways of the city of New York, for the converting of said line from a horse railroad to an electric railway operated by underground current electricity, it was stipulated by the then commissioner of highways of the city of New York that the tracks, switches and turnout should be laid on the lines and grades approved by the commissioner of highways, and it was further stipulated that the grade of the pavement between the rails and the slot should be such as should be prescribed by the commissioner of highways and should be determined upon as part of the plans for construction when the same were approved.

Thereafter the said underground electric railway structure and the tram rails thereon were constructed on the lines and grades approved and prescribed by the then commissioner of highways and the same has ever since been and now is maintained at such grade.

The pavement of West Fifty-ninth street between Fifth and Eighth avenues was deemed by the city officers to be in a condition of disrepair and in need of repavement, and the president of the borough of Manhattan requested an appropriation of funds to repave West Fifty-ninth street, with other streets. On February 9, 1917, the board of estimate authorized the expenditure of the necessary funds to repave West Fifty-ninth street from Fifth to Eighth avenues, and plans were prepared under the direction of the borough president for such repaving, with asphalt on a concrete foundation. Such plans had been prepared as far as the establishment of the grades for the new pavement, but further progress was deferred because of the subway work going on under said street. On February 28, 1919, on the application of the borough presi-

dent, the board of estimate and apportionment authorized the expenditure of necessary funds to repave certain streets in the borough of Manhattan, and on March 7, 1919, said board approved the repaving of West Fifty-ninth street between Fifth and Eighth avenues and plans therefor were prepared under the direction of the borough president and approved on April 16, 1919, by the chief engineer of the borough of Manhattan and the commissioner of public works thereof, as acting borough president. These plans, as approved, provide for the repaving of West Fifty-ninth street at a surface grade level or crown which will in places be higher (in some places as much as two and one-half inches) than the tram rails of the north track of defendant's railroad. On June 19, 1919, the city entered into a contract for the repaving of West Fifty-ninth street between Fifth and Eighth avenues, based on the approved plans.

By section 178 of the Railroad Law (Consol. Laws, chap. 49 [Laws of 1910, chap. 481], as amd. by Laws of 1912, chap. 368) it is provided that "Every street surface railroad corporation, so long as it shall continue to use or maintain any of its tracks in any street, avenue or public place in any city or village, shall have and keep in permanent repair that portion of such street, avenue or public place between its tracks, the rails of its tracks, and two feet in width outside of its tracks, under the supervision of the proper local authorities, and whenever required by them to do so, and in such manner as they may prescribe. In case of the neglect of any corporation to make pavements or repairs after the expiration of twenty days' notice to do so, the local authorities may make the same at the expense of such corporation." (See, also, Railroad Law [Gen. Laws, chap. 39; Laws of 1890, chap. 565], § 98, as amd. by Laws of 1892, chap. 676; Laws of 1884, chap. 252, § 9.)

Acting thereunder, on or about the 24th day of April, 1919, the city of New York, by the acting borough president of Manhattan, notified the defendant, by a written notice served upon it, that the aforesaid portion of West Fifty-ninth street, between Fifth and Eighth avenues, between the tracks, rails of the tracks and two feet in width outside of the tracks of the said street surface railroad maintained and operated

by the defendant, was out of repair and in need of repaving, and the defendant was by said notice required to repave in accordance with the aforesaid plans and specifications on file in the office of the president of the borough of Manhattan and under the supervision of said president.

Defendant has failed to comply with this notice because of the requirement that the tram rails of its north tracks were required by said plans to be raised before repaving. On July 10, 1919, the borough president wrote defendant, reciting the notice theretofore given to it on April 24, 1919, that the city of New York was about to repave the roadway of Fifty-ninth street in accordance with the plans and specifications on file and that the city had entered into a contract for the repaving of the street. In order that the tracks of the railroad of defendant in said street might conform to the crowns and grades of the new pavement, defendant was required to adjust its tracks to the crowns and grades indicated in the filed plans, and inquiry was made as to whether it would undertake the adjustment of the tracks that the beginning of the repaving work might be arranged for. Defendant replied, that since there had been no change in the established grade of Fifty-ninth street since its tracks were constructed, there was no duty upon it to change the grade of its track structure, and in view of the heavy expense which would be incurred in such change, and of its then financial condition, defendant stood upon its rights and declined to change the grade of its track structure. It did, however, express its readiness to make the necessary renewals to its track at its then grade.

On September 25, 1919, the contractor was ordered to proceed with the work of repaving, and continued the work until the south side of Fifty-ninth street had been repaved from Fifth to Eighth avenues and the north side from Fifth to Sixth avenues, when notification was given by the acting borough president to suspend the work pending the outcome of this proceeding. The petition of the city of New York, by the president of the borough of Manhattan, sets forth that the repaving of West Fifty-ninth street, between Fifth and Eighth avenues, cannot be reasonably and properly prosecuted and completed in accordance with the aforesaid

plans on file in the office of the president of the borough of Manhattan, without the tram rails of the north track of the Belt Line Railway Corporation being made to conform to the surface grade level or crown of the street, as aforesaid, prior to the beginning of or simultaneous with the prosecution of the said work of repaving, and further that in the event that the city of New York repaves said West Fifty-ninth street, between the avenues aforesaid, without the tram rails of the north track of the Belt Line Railway Corporation having been made to conform to the surface grade level or crown of the street, upon the completion of the work the pavement will in numerous places be inches higher than the surface of the said tram rails, and as a consequence thereof, depressions and traps will exist in said street.

It is further alleged that the disrepair of the pavement on the north side of West Fifty-ninth street between Sixth and Eighth avenues is at the present time in such condition as to be dangerous to the use thereof by persons and vehicles, and it is urgent and necessary that the work of repaving between said avenues proceed at the earliest possible time; and that the acting president of the borough of Manhattan is ready and anxious to order the contractor to resume and complete the work of repaving West Fifty-ninth street between Fifth and Eighth avenues and is restrained and prevented from doing so solely by the refusal of the Belt Line Railway Corporation to conform its tram rails to the approved grade of the surface of the street.

The relief sought is that a peremptory writ of mandamus issue out of and under the seal of this court, directing and commanding the said Belt Line Railway Corporation to forthwith, at its own expense, make, repair and construct the surface rails of the street surface railway now maintained by said Belt Line Railway Corporation, along West Fifty-ninth street between Fifth and Eighth avenues, so that said surface rails shall conform to the surface grade level or crown of the street surface of West Fifty-ninth street between Fifth and Eighth avenues, when repaved, pursuant to the plans and specifications relating to said improvement, now on file in the office of the president of the borough of Manhattan.

The affidavit of the chief engineer of the department of

People ex rel. City of N. Y. *v.* Belt Line Ry. Corp.    99

App. Div.]                    First Department, July, 1920.

public works for the borough of Manhattan, in charge of repaving, supports the allegations of the petition herein. It shows that the approved plans clearly disclose the surface grade level or crown to which Fifty-ninth street is to be repaved will be in numerous places higher than the tram rails of the north track of defendant's railroad as then maintained and operated, and that unless such rails are made to conform to the grade, shown by such plans, prior to the resumption of repaving, the work cannot reasonably and properly be prosecuted, and should the city proceed with the work without the change in the rails, the result would be the creation in the street of depressions extremely dangerous to persons and vehicles using the street. It further shows that the north track tram rails are now on a lower level than the south track rails, and that it is the intention of the plans to eliminate this difference, so that there will be a perfect crown between curb lines; that the new surface of the street will afford better drainage; and that the convenience, safety and comfort of the public using the street will be materially increased.

The answering affidavits set forth certain provisions of chapter 511 of the Laws of 1860, under which the legislative grant was made of the right to lay, construct, operate and use a railroad on certain streets in the city of New York, including Fifty-ninth street, from First to Tenth avenues. It further appears that Fifty-ninth street between Sixth avenue and Columbus Circle has what is known among highway engineers as a side-hill cross-section, that is, one side of the street owing to natural causes is higher than the other, and this difference of level affects the entire cross-section, changing the relative elevation of sidewalks, curbs, gutters and of defendant's tracks in the center of the street. It is desirable to have sidewalks laid at a nearly uniform cross slope in order that the sidewalks may slope uniformly from house line to gutter and because if such slope is too steep it is slippery when covered with ice and snow, and if too flat does not drain properly. For this reason, where a street is on a side-hill cross-section, the difference in levels between the grades at property lines on either side of such street usually results in a similar difference in level between the curb lines on either side of the street. It is desirable to have the center

First Department, July, 1920.                    [Vol. 193.

of the roadway at a higher elevation than in the gutters in order to have a proper crown to drain the water from the center of the street to the gutter on either side. Where one curb is higher than the other, if a uniform crown from the center to either side were followed, it would result in having one gutter deeper than the other. It is not desirable on the one hand to have a gutter so deep as to make an awkward step from the sidewalk to the street level, and on the other hand it is not desirable to have the gutter so shallow as to endanger flooding the sidewalk when the gutter is filled with water after a heavy rain, and especially when badly blocked with snow.

Where on account of a side-hill cross-section the curbs of a street are at different levels, it is customary to make up this difference on a cross-section of the street in part by using gutters of different levels on either side and in part by using an unsymmetrical crown for the street itself. In working out this unsymmetrical crown for the street, it is frequently customary where there are double street car tracks in the street, to take advantage of this fact and make it possible to keep the variation in the slope of the street from the center to the gutters as small as possible, by taking out part of the difference in level by a corresponding difference in level between the tracks themselves. This results, therefore, in the fact that on streets having the side-hill cross-section, it is customary to have the track on the down-hill side of the street laid at the lower elevation than the track on the up-hill side of the street, and this fact accounts for the existing situation on Fifty-ninth street between Sixth avenue and Columbus Circle where the north track of the Belt Line Railway Corporation is located at a level lower than the south track of said company, the north curb of Fifty-ninth street at this location being located at a lower level than the south curb.

The difference in levels between the tracks results in a slope in that portion of the street between the tracks commonly known as the dummy. This difference in level across the dummy strip is not objectionable because this strip is not used to any considerable extent by vehicles for longitudinal traffic along the street, as a vehicle driving on the

dummy strip would be interfered with by cars operating in either direction, and for vehicles crossing from one walk to another the slight difference in level between the two tracks is not material. It is in line with the best current engineering practice, where there are double tracks in a street with a side-hill cross-section, to construct one track at a lower level than the other, and such practice has been followed in other streets in New York city and elsewhere.

The present surface contour of Fifty-ninth street between Fifth avenue and Columbus Circle provides proper drainage for the street, and such surface contour is not dangerous; and such contour is better than the one shown on the proposed paving plan for said street. The difference in level of the two tracks on Fifty-ninth street between Sixth avenue and Columbus Circle does not create a dangerous condition. The underground electric track structure on Fifty-ninth street between Fifth avenue and Columbus Circle is of heavy and complex construction, consisting of steel tram and slot rails resting on cast iron yokes, imbedded in concrete foundations. The raising of the grade of the tram rails on Fifty-ninth street, as prayed for by the city herein, would necessitate a change in the grade of the entire track structure, and would necessitate the excavation of the steel and iron framework from the encasing concrete, and in the nature and magnitude of the work it would be equivalent to the relocation of the entire track structure. It would cost about $10,000 to excavate the steel and iron framework from the concrete and relocate the track structure on Fifty-ninth street at the grade set forth in the proposed plan. Such expense is unwarranted, and the condition of Fifty-ninth street between Sixth avenue and Columbus Circle would not be as good as if the street were repaved at its present contour, and the tracks left at their present level. The repaving of West Fifty-ninth street without change of the level of the tram rails of the north track will not be dangerous to persons or traffic using said street.

It is denied that the roadway between the tracks is in bad condition, it having been repaved with asphalt within eighteen months, and being in good condition. It is also alleged that the repaving can be reasonably and successfully done without changing the grade of the tracks; that the reason for dis-

repair of the roadway was the subway construction work proceeding under portions thereof, and since such work was completed, the surface having been permanently restored; and finally that the work of repaving, if done without change of grade, will not create any street depressions dangerous to persons or vehicles using the same.

The defendant contends that the president of the borough of Manhattan, even though acting under the control of the board of estimate and apportionment of the city of New York, is without power to direct the relaying of the tracks in question at a different grade from that now in existence for the reason that the present electric street railroad structure in Fifty-ninth street was legally constructed and is now maintained at the grade fixed by the State. It bases this contention, *First.* On the fact that an application was duly made to the State Board of Railroad Commissioners pursuant to law in 1897 for permission to convert the then existing horse railroad into an electric railroad and that pursuant to the provisions of the certificate of the State Board the defendant's predecessor entered into an agreement with the then commissioner of highways of the city of New York acting under delegated power from the State providing for the manner of construction of the electric railroad, including the grade at which it was to be placed, which grade has never since been departed from. It, therefore, contends that it is entitled to maintain its tracks at such grade until the same is changed by the State acting through the Public Service Commission. *Second.* That it has express legislative authority to use Fifty-ninth street for street railroad purposes and to maintain the tracks at their present grade, and by express provision of statute such street railroad structure cannot be interfered with by the city. *Third.* That there has been no grade fixed by the State through any board or officer having jurisdiction in the premises necessitating the raising of the said tracks. *Fourth.* That a borough president is without power of any kind in the premises.

The defendant heretofore applied for a peremptory writ of mandamus commanding the president of the borough of Manhattan and the commissioner of public works thereof to issue a permit to it for the removal of the rails on the northerly

tracks at the point in question and for the laying of new rails in place thereof at the present grade.   It was held that the municipal authorities had the statutory power to alter and improve streets and to require street railways to change the line of tracks; and that the condition imposed by the commissioner of public works for the raising of the tracks now complained of was a reasonable one.   The application thereupon was denied (See *People ex rel. Belt Line Railway Corp.* v. *Dowling,* N. Y. L. J. Oct. 29, 1918) and on appeal to this court (187 App. Div. 953) the order was affirmed without opinion.

The general power of the city authorities when public necessity and convenience so require to compel a street surface railway company to make necessary changes in its grade or line was declared in *People ex rel. City of Geneva* v. *G., W., etc., Traction Co.* (112 App. Div. 581; affd., 186 N. Y. 516).   As was said in that case: Any other rule would make it possible for a railroad company to forever prevent improvements and development in a particular section of the municipality and would make it the arbiter as to what might or ought to be done for the improvement or benefit of any particular locality. And the court further said (p. 588): " The proposition is intolerable that a street surface railroad company or other corporation which may be given a license to occupy the streets of a municipality in a particular manner may not be compelled, when the conditions and locality change, when public convenience and necessity require, to make such changes in its grade or line as the public necessity may demand."   The defendant, however, claims that the case just cited may be distinguished from the case at bar because the State made no grant to the city of New York of the former's right to regulate and change the grade of street railroad tracks.   It contends that such regulation is vested solely in the Public Service Commission under section 50 of the Public Service Commissions Law.   It further contends that the act under which the right to construct the railroad was granted (Laws of 1860, chap. 511) confers special exclusive and unassailable rights in the defendant which make it superior to any interference by the city because of certain language used in section 4 of said act reading as follows:

First Department, July, 1920.                    [Vol. 193.

" § 4. The mayor, common council and the several officers of the corporation of the said city of New York, and the said corporation, are hereby prohibited from giving any assent to, or allowing any company claiming to derive authority under the act entitled 'An act to authorize the formation of railroad corporations and to regulate the same,' passed April second, eighteen hundred and fifty, or act amendatory thereof, or in addition thereto, to construct any railroad in or upon any or either of the said streets or avenues and from doing any other act to hinder, delay or obstruct the construction or operation of said railroad as herein authorized. And it is hereby made the duty of the said mayor, common council and other officers to do such acts within their respective departments as may be needful to promote the construction, and protect the operation of the said railroad as provided in this law; any act or thing done in violation hereof shall be inoperative and void. * * *."

It is argued that this language gives the defendant special rights and privileges which make it impossible for the city of New York to take such action in behalf of the public interest or public good as the city officials may deem necessary if such action involves any interference with the defendant's tracks or equipment. I am unable to find in such general terms the expression of any legislative intention to confer upon any company operating a railroad in Fifty-ninth street immunity from duties and responsibilities which ordinarily attend the exercise of a street railroad franchise. This is no more than a legislative command not to obstruct or interfere with the construction or operation of the railroad and nothing has been done by the city or any of its officials which comes within such an inhibition.

The defendant seeks to spell into this general language some irrevocable right under which it claims that it can maintain its tracks at their present level regardless of the public interest, convenience or safety and without consideration for other travel on said street, which in the opinion of the appropriate city authorities requires a change of its grade to which the tracks must be conformed. I find no force in this claim.

Nor do I find the position tenable that there has been no delegation of power to the municipality to exercise any control or regulation of the grade of the surface railroads in the city of

New York. Section 383 of the Greater New York charter (Laws of 1901, chap. 466, as amd. by Laws of 1907, chap. 383) provides as follows: " The president of a borough * * * may appoint and at pleasure remove a commissioner of public works for his borough, who may discharge all the administrative powers of the president of the borough relating to streets, sewers, public buildings and supplies conferred upon him by this act * * *. He shall, within the borough for which he shall have been elected, have cognizance and control: 1. Of regulating, grading, curbing, flagging and guttering of streets and laying of crosswalks. 2. Of constructing and repairing public roads. 3. Of paving, repaving, resurfacing and repairing of all streets, and of the relaying of all pavements removed for any cause. 4. Of the laying or relaying of surface railroad tracks in any public street or road, of the form of rail used, or character of foundation, and the method of construction, and of the restoration of the pavement or surface after such work. * * * "

Concededly such power must be exercised under the control of the board of estimate and apportionment, and such control was exercised in the pending case. I think the 4th subdivision of this section contains a grant of power sufficient to cover the present case, where the tracks are to be relaid to conform to the grade of the street as determined by the borough president. Even though there be expert difference of opinion as to whether the change in the crowning of the street is necessary or whether it is the best form of engineering construction, there is no attack upon the good faith of the borough president in creating the new crown nor any contention that he is influenced by aught but what he deems proper regard for the public safety in so doing. If the contention of the defendant is correct, the situation would be presented which is condemned in the *Geneva Case* (*supra*) where a necessary public improvement beneficial to the community could be prevented of execution by the opposition of a street railroad company claiming a right paramount to that of the general public. And the same result would follow if the Public Service Commission had the virtual power of review of a determination of a city official on a subject as to which the charter fairly gives him complete control.

In *People ex rel. City of New York* v. *New York Railways*

*Co.* (217 N. Y. 310), relied on by defendant, which held that the city of New York could not require the relocation of the tracks of a street railroad, the court said: " Equally true is it, and for identical reasons, that the authority to the board of aldermen to regulate the use of the streets does not empower it to appropriate to the occupation and use of the respondents, by a relocation of the track in question, a part of the street other than that upon which their tracks have been lawfully constructed. · It does delegate to it police power enabling it to reasonably control in divers ways the care of the railroad structures upon the streets and the operation of the cars upon them. The judicial decisions uphold many instances of such control. The rights of a railroad corporation upon the parts of the streets appropriated to its use must be so exercised that the free use of the streets, for the purposes and in the modes inherent in their creation, will not be unreasonably interfered with. It is a part of the regulative power of the local authorities to secure such result."

I think the part of the opinion just quoted applies to the case at bar. It was referred to in the opinion in *Stern* v. *International Railway Co.* (220 N. Y. 284) where the court said (at p. 296): " The point is made that if the centre poles were safe when first erected, the city could not compel them to be moved though they later became dangerous. We are referred to our decision in *People ex rel. City of New York* v. *N. Y. Railways Co.* (217 N. Y. 310, 317), but we think it is inapplicable. There the attempt was made to compel a relocation of the tracks; and the location of the tracks was held to be of the substance of the franchise. The State might relocate them in the exercise of the police power, but not the municipality. Here the things to be moved are mere incidents or appurtenances; they do not affect the location of the right of way; and wherever they are placed, the franchise in its substance remains intact." The last two sentences above quoted from the *New York Railways* case are then cited, with approval.

In *City of New York* v. *Hudson & Manhattan R. R. Co.* (229 N. Y. 141) it was held that the certificate issued by the board of rapid transit commissioners to the railroad company whereby it was permitted to construct and maintain certain exits with covered shelters, known as kiosks, became a con-

tract, under the statute, between the city and the company, and that the city having thereafter widened the street, so that the kiosks were left standing within the new lines of the roadway could not compel the company to remove them and relocate them on the new sidewalks at the company's expense. In its opinion, however, the court recognized the rule laid down in the *Stern* case, that if the kiosks, as first located, were mere incidents or appurtenances of the defendant's franchise which became encroachments when the roadway was widened, the proper city authorities might compel their removal when they became an obstruction to the public use.

In the case at bar, I believe that the tracks in question sought to be elevated were mere incidents or appurtenances, and did not affect the location of the right of way; at whatever elevation they were sought to be placed, the franchise in its substance remained intact. There was no relocation of the tracks. Therefore, the rule laid down in the *Stern* case applies and the appropriate city authorities had power to act in the public interest, and to prevent the tracks becoming a menace to the public safety.

I am of the opinion that the borough president acted within his lawful power and authority in making the direction in question and the order appealed from is correct and should be affirmed, with ten dollars costs and disbursements.

Order reversed, with ten dollars costs and disbursements, and motion denied, with fifty dollars costs.