643 A.2d 1005

ALTHEA CONTEY, PLAINTIFF–APPELLANT, v. NEW JERSEY BELL TELEPHONE COMPANY AND ROCKLAND ELECTRIC COMPANY, DEFENDANTS–RESPONDENTS, AND JOHN DOE (OWNER OF UTILITY POLE AND SURROUNDING PROPERTY); BOROUGH OF FRANKLIN LAKES, COUNTY OF BERGEN; AND STATE OF NEW JERSEY, DEFENDANTS.

Argued March 14, 1994—Decided July 20, 1994.

*Anthony C. DiLella* argued the cause for appellant.

*Leonard P. Rosa* argued the cause for respondent New Jersey Bell Telephone Company (*Harwood Lloyd,* attorneys).

*C. Douglas Reina* argued the cause for respondent Rockland Electric Company (*Abrams, Blatz, Gran, Hendricks & Reina,* attorneys; *Barry E. Rosenberg,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This case requires us to consider again the limits of proximate cause and the limits of legal duty as defined by the foreseeability of harm to others. The case arises from an automobile accident in the Borough of Franklin Lakes. Plaintiff, Althea Contey, while driving on an unfamiliar street in the early morning hours, missed an unmarked turn in the road and struck a utility pole. The pole stands approximately ten inches from the curb line at the beginning of an S-curve in the road. To drivers traveling on the roadway, the position of the pole appeared to be in the middle of the roadway. Injured in the accident, Ms. Contey sued the New Jersey Bell Telephone Company, the Rockland Electric Company, the Borough of Franklin Lakes, the County of Bergen, and the State of New Jersey. (The telephone company owned the pole,

and the electric company had permission to locate its wires on the pole.)

Ms. Contey settled or voluntarily dismissed her claims against the public bodies. However, she pursued her claims against the telephone company and the electric company. The trial court granted summary judgment in favor of the utilities. In an unreported opinion, the Appellate Division affirmed on the basis of its earlier holding in *Oram v. New Jersey Bell Telephone Co.*, 132 *N.J.Super.* 491, 334 *A.2d* 343 (1975), that a utility assumes no liability for the placement of its pole adjacent to the roadway when a collision occurs because a vehicle departs from the traveled section of the road. One judge dissented, reasoning that plaintiff had presented an ordinary negligence case and that the majority allowed unwarranted immunity to the utility companies. Plaintiff appealed as of right, *R.* 2:2–1(a)(2).

## I

In essence the case at bar creates a classic case of intervening causation. "This presents the question whether the asserted negligence in the placement of the pole is to be considered as the proximate cause, or whether the operation or movement of the colliding vehicle may be said to be the real cause, the collision with the pole being merely incidental."

[*Padgett v. West Fla. Elec. Coop., Inc.*, 417 *So.2d* 764, 766 (Fla.Dist.Ct.App.1982) (quoting T.C. Williams, Annotation, *Injury to Traveler From Collision With Privately Owned Pole Standing Within Boundaries of Highway*, 3 *A.L.R.2d* 6, 56 (1949)).]

We can answer the question in either of two ways. Then–Judge Cardozo provided a familiar legal test in *Stern v. International Railway Co.*, 220 *N.Y.* 284, 115 *N.E.* 759, 761 (1917):

The poles, if placed and maintained with due regard for the public safety, are not unlawful obstructions. * * * [T]hey must be so located as to avoid unreasonable and unnecessary danger to travelers upon the highway. * * *

The question is whether the place chosen is so dangerous and the danger so needless that the choice becomes unreasonable. If danger in that degree is present, [the company is] charged with liability.

Courts in Florida and Pennsylvania have held that utility companies may be liable to motorists who stray from the traveled portion of a highway for harm caused by the negligent placement

and maintenance of utility poles. *Padgett, supra,* 417 *So.*2d 764; *Nelson v. Duquesne Light Co.,* 338 *Pa.* 37, 12 *A.*2d 299 (1940); *Scheel v. Tremblay,* 226 *Pa.Super.* 45, 312 *A.*2d 45 (1973).

In a relatively recent case, *McMillan v. Michigan State Highway Commission,* 426 *Mich.* 46, 393 *N.W.*2d 332 (1986), the Michigan Supreme Court rejected the concept that a utility owes no duty to an occupant of a vehicle leaving the traveled portion of the highway. That concept rests on the premise that errant motorists are not properly using the highway. *Id.* at 337. The Michigan court reasoned that because drivers will foreseeably leave the traveled portion of the highway, a poorly-placed utility pole might pose an unreasonable danger to such a traveler. *Id.* at 338–39. The test that court adopted is whether reasonable minds could differ about a utility's negligence in placement of the pole, considering factors such as location of the pole, the pole's proximity to the highway, the configuration of the roadway, the notice to the utility company of previous accidents at that location, and alternative, less-dangerous locations for the pole. *Id.* at 340. If reasonable minds could so differ, the issue of negligence is for the jury. *Ibid.*

Early common law recognized the foreseeability of a vehicle veering from a paved way and colliding with a utility pole. In *Lambert v. Westchester Electric Railroad Co.,* 191 *N.Y.* 248, 83 *N.E.* 977 (1908), a firefighter aboard a moving fire wagon sustained injuries when he hit a trolley pole on the edge of a roadway. The court held that the trolley company should have foreseen that a wagon might, when rapidly departing from a firehouse, lose control and leave the paved surface of the driveway when entering the street. *Id.* at 978. New Jersey law had acknowledged the duty to foresee that vehicles may leave the roadway and collide with an adjacent utility pole. See *Hoyt v. Public Service Electric & Gas Co.,* 117 *N.J.L.* 106, 187 *A.* 43 (E. & A. 1936), in which the improper fastening of a transformer to a utility pole that leaned over the traveled portion of the roadway injured a driver in a collision. The court held that a utility should exercise "reasonably

careful judgment" when designing and maintaining poles because errant motor vehicles are likely to strike them. *Id.* at 109, 187 *A.* 43.

However, in *Oram, supra,* 132 *N.J.Super.* 491, 334 *A.*2d 343, the Appellate Division held that the placement of a pole could not have proximately caused an injury when the car veered from the traveled portion of the highway. "[The utility] need only antici-pate ordinary travel which 'contemplates an automobile being driven and kept on the roadway.'" *Id.* at 494, 334 *A.*2d 343 (quoting *Monaco v. Comfort Bus Line, Inc.,* 134 *N.J.L.* 553, 557, 49 *A.*2d 146 (E. & A.1946)). However, *Oram*'s reliance on *Monaco* is inapposite because *Monaco* dealt only with the municipalities' design of a bridge and not a utility's placement of its pole near a roadway, and therefore, its reasoning does not contemplate the duty of a third party.

One difference between our earlier and later law may be that over the years our governmental bodies have paved highways and installed curbs. The public right-of-way is usually wider than the paved or curbed portion of the road. Does that alter the legal analysis? Cardozo's test had referred to "travelers upon the highway." *Stern, supra,* 115 *N.E.* at 761. Is the "highway" only the paved area or the area within the curbs? The Appellate Division recently held that a public body had a duty to maintain more than the traveled lanes of a roadway. In *Furey v. County of Ocean,* 273 *N.J.Super.* 300, 641 *A.*2d 1091 (1994), that court found liability under the Tort Claims Act because

> there was evidence that the roadway was not safe for drivers in general because it did not have an adequately maintained shoulder, and because of the foreseeable necessity that drivers might, while travelling, have to pull over slightly onto the shoulder of such a two-lane roadway for numerous reasons.
>
> [*Id.,* 641 *A.*2d at 1097.]

Thus, to say that the utility "need only anticipate ordinary travel," *Oram, supra,* 132 *N.J.Super.* at 494, 334 *A.*2d 343, begs the question. Whether stated in terms of proximate causation or the existence of a duty, further analysis is warranted.

As the Michigan Supreme Court explained,

*"It is quite possible to state every question which arises in connection with 'proximate cause' in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur?* Such a form of statement does not, of course, provide any answer to the question, or solve anything whatever; but it may be helpful since 'duty'—also a legal conclusion—is perhaps less likely than 'proximate cause' to be interpreted as if it were a policy-free factfinding. *Thus, 'duty' may serve to direct attention to the policy issues which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact."*

[*McMillan, supra,* 393 *N.W.*2d at 334 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42, at 274 (5th ed. 1984)).]

We have used the foregoing concepts in a wide variety of contexts. In *Kelly v. Gwinnell,* 96 *N.J.* 538, 476 *A.*2d 1219 (1984), the social host argued that when an inebriated guest, driving home from a party, accidently injures another, the guest's conduct, not the conduct of the host who served the alcoholic beverages to the guest, is the proximate cause of the injuries. We held, however, that " '[w]hether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Id.* at 544, 476 *A.*2d 1219 (quoting *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)). We have similarly defined the limits of proximate cause as " 'an instrument of fairness and policy.' " *Brown v. United States Stove Co.,* 98 *N.J.* 155, 173, 484 *A.*2d 1234 (1984) (quoting *Caputzal v. Lindsay Co.,* 48 *N.J.* 69, 77, 222 *A.*2d 513 (1966)).

## II

Each year approximately 1500 persons die because of vehicles colliding with utility poles. Ronald D. Hughes, U.S. Dep't of Transp., *Breakaway Timber Utility Pole Installations in Kentucky* 2 (1991). In fixed-object collisions resulting in fatalities, the frequency with which vehicles hit utility poles is second only to the frequency with which they hit trees. Approximately 65,000 injuries occur annually because of vehicle-utility-pole accidents. *Ibid.*

The Federal Highway Administration (FHA) has considered countermeasures to reduce or mitigate collisions with utility poles.

Utilities could place lines underground, thereby disposing of the need for poles; place poles further from the roadway; reduce pole density; or shield poles with guardrails. *Ibid.* For some years the FHA has been experimenting with a breakaway utility pole. That type of pole is comprised of three sections. A hinge connects the short upper section to the long middle section. On impact, the middle section breaks away from the base, leaving a short stump over which the vehicle can pass. The middle section swings upward out of the path of the vehicle because of the hinge. Cables connecting the upper section to the adjacent poles prevent the upper and middle sections from falling on the vehicle. *Id.* at 6. Kentucky and Massachusetts have installed those poles in several locations. In Massachusetts, breakaway poles have yielded minor or no injuries to vehicle occupants in five instances. Richard P. Buser & Carol A. Buser, U.S. Dep't of Transp., *The Breakaway Timber Utility Pole: A Survivable Alternative* 41–43 (1993).

Thus, because the risk is great, the public interest in the solution is very great. But after a "weighing of the relationship of the parties," *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291, we conclude that the structure of government suggests that the primary responsibility for the safety of the motoring public rests with our highway engineers and the public bodies by whom they are employed at the State, county, or local level.

Under New Jersey law, utilities have no right unilaterally to determine the location of poles or facilities along the roadway. *N.J.S.A.* 48:17–8 grants permission to any utility company "organized under the laws of this or any other State," to "erect, construct and maintain" its poles "in, upon, along, over or under any public street, road or highway," after obtaining the property owner's permission. *N.J.S.A.* 48:17–11 states that the utility must erect its poles in accordance with ordinances and resolutions adopted by the local municipality or board of freeholders that designate "the *location,* number and size of the poles." (Emphasis added.) The statute further provides that such poles shall be

"so placed as not to interfere with the safety or convenience of persons or vehicles traveling on any such street, road or highway."

The Borough of Franklin Lakes has adopted an ordinance regulating the location of poles. That ordinance states, in relevant part:

SECTION 2. All poles or posts hereafter to be erected, constructed, reconstructed, maintained and operated shall be located and placed back of and adjacent to the curb lines where shown by official maps of this Borough and within eighteen inches thereof, and at the points or places now occupied by the poles or posts of [New Jersey Bell Telephone] Company, its successors and assigns, and at other convenient points or places upon the streets, roads, avenues and highways, adjacent to such curb lines.

Before proceeding with the work of erecting any poles under the permission and consent herein contained, said Company shall file with the Mayor and Council of this Borough a map or plan showing the location and size of any such proposed pole or poles, which map or plan shall be first approved by said Mayor and Council, or their authorized representative, before any such work is begun as aforesaid.

[Borough of Franklin Lakes, N.J., Ordinance 76 (Mar. 14, 1949).]

A potential shortcoming of that ordinance is that it does not sufficiently involve the borough in any necessary safety analysis. A possible consequence of a failure by a public body to consider the location of utility poles in highway design is that the public body may not thereafter enjoy the immunity that would ordinarily attend the plan and design of a public highway. *N.J.S.A.* 59:4–2. *See Thompson v. Newark Hous. Auth.,* 108 *N.J.* 525, 531 *A.*2d 734 (1987) (holding that "plan or design" immunity exists only for an "approved feature" of a public work).

In *Ball v. New Jersey Bell Telephone Co.,* 207 *N.J.Super.* 100, 504 *A.*2d 29 (App.Div.), *certif. denied,* 104 *N.J.* 383, 517 *A.*2d 391 (1986), the State had permitted the utility to continue to maintain a pole along a highway within the public right-of-way. The State then had installed a guardrail behind rather than in front of the utility pole, contrary to highway-safety standards. The Appellate Division held the State, not the utility, responsible for the danger to the motoring public. The *Ball* court recognized that compliance with or deviation from a standard of conduct defined in a statute or regulation is a "relevant circumstance to be considered" when determining tort liability. *Id.* at 112, 504 *A.*2d 29. The

court noted that "while the utility is obliged to design facilities to be installed within the highway rights of way, the Department of Transportation is primarily responsible for insuring that appropriate safety standards are satisfied." *Ibid.* (citation omitted).

 We believe that responsibility for the safety of motorists should rest with those who own, control, and maintain the thoroughfare. Although utility companies have a duty to foresee that motorists will leave the traveled portion of the highway, the governmental bodies and highway planners are best suited to determine how the utilities should fulfill that duty. Those public bodies are in the best position to provide and to enforce standards and regulations governing utilities. Utilities do not have the right to locate poles wherever they deem expedient. Public bodies may by their ordinances and regulations require the relocation, removal, shielding, or redesign of poles that do not meet safety standards. In this case, the ordinance required that the utility place its poles within eighteen inches of the curb, presumably to facilitate street lighting. No indication exists in the record that the borough considered whether the pole should not have been located at the S-curve in the road.

To conclude from a view of the accident scene that a motorist might foreseeably have deviated from the unmarked curve in the road and have struck the adjacent utility pole does not require an engineering degree. Collisions with that pole had occurred twice before. Although the record does not disclose who put up the warning sign before the curve and placed a reflector beside the pole following this accident, we presume the borough took that action. The public body, or the utility at the public body's direction, should have done that before this accident. In light of the two prior collisions with this pole, we might be inclined to hold the utility company liable. However, we conclude that highway planners, not utility managers, are best equipped to determine the location and design of fixtures in or near a right-of-way. One need only travel on a roadway as well designed as the Garden State Parkway to note the continuing improvements in reflectors,

exit signs, acceleration-deceleration lanes, and the many other features of highway safety made by a State agency for the protection of the motoring public.

A uniform standard of care imposing the responsibility for highway safety on the public bodies is the proper solution. When a public utility has located its poles or structures within public rights-of-way in accordance with the location and design authorized by the public body, the utility, in the absence of countermanding directions from the public body, should have no further duty to protect the motoring public. Often, utility fixtures are uniformly located at a prescribed distance from curb lines. *See Hellman v. Julius Kolesar, Inc.,* 399 *N.W.*2d 654, 656 (Minn.Ct. App.1987) (noting that utility pole was located in line with other utility and traffic fixtures). Public bodies will want to ensure that the location and design of such fixtures are approved features of the highway design to engage the protection of the Tort Claims Act. *See Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes,* 90 *N.J.* 582, 449 *A.*2d 472 (1982) (holding public entity immune from liability only when it approved in advance the condition of property claimed to be dangerous or defective).

The judgment of the Appellate Division is affirmed. No costs.

HANDLER, J., dissenting.

I dissent in this rather ordinary negligence case because the majority finds grounds to exonerate utilities from any responsibility for the placement of telephone poles and, in effect, accords them unwarranted immunity. Generally, I agree with Judge Brochin's dissent from the Appellate Division's judgment substantially for the reasons that he set forth, and would reverse and remand the case for trial.

The majority seemingly acknowledges that negligence can occur with respect to the placement of a utility pole along a travelled roadway that contributes to an accident caused by an errant motorist whose car leaves the road and strikes the pole. 136 *N.J.* at 585, 643 *A.*2d at 1007. It thus apparently distinguishes *Oram v.*

*New Jersey Bell Telephone Co.*, 132 *N.J.Super.* 491, 334 *A.*2d 343 (App.Div.1975), in which the court ruled that the defendant utility company was not liable when the plaintiff's car was forced off the road by another car and hit a utility pole because "a telephone company is under no obligation of guarding against extraordinary exigencies created when a vehicle leaves the travelled portion of a roadway out of control." *Id.* at 494, 334 *A.*2d 343.

In *McMillan v. Michigan State Highway Commission*, 426 *Mich.* 46, 393 *N.W.*2d 332 (1986), the Michigan Supreme Court ruled that a utility could be found to owe a duty to a motorist who was a passenger in a car that left the traveled portion of the highway when the car was struck by a hit-and-run driver and collided with a utility pole. The *McMillan* court reversed the trial court's granting of summary judgment to the utility company. In so doing, the court overruled its prior case law because it

> "fail[ed] to impose *any* obligation of reasonable conduct [on utility companies] for the benefit of occupants of vehicles which leave the traveled portion of the highway. We fail to see an overriding policy which would insulate the defendant [utility company] in all cases in which a pole is placed outside the traveled portion of the highway."
>
> *[Id.*, 393 *N.W.*2d at 339–40.]*

The court delineated a number of factors for a court to consider in determining whether summary judgment is appropriate in such utility-pole negligence cases, including "the location of the pole, its proximity to the roadway, the configuration of the roadway, whether the utility company had notice of previous accidents at that location and whether alternative, less dangerous locations for the pole existed." *Id.*, 393 *N.W.*2d at 340. The court continued that "[a]fter considering these factors and any other factor which may be probative of the issue, the trial court, upon finding that reasonable minds could differ as to whether the defendant acted negligently in the placement of the pole, should place the issue before the jury to decide." *Ibid.*

The *McMillan* case fairly accounts for the factors that would be most relevant in determining whether a utility violated the duty of

care it owes to the public in the placement of utility poles. In this case a "factor which may be probative of the issues" could include the existence of the municipal ordinance adopted by the Borough of Franklin Lakes. *See id.,* 393 *N.W.*2d at 340; *see also Ball v. New Jersey Bell Tel. Co.,* 207 *N.J.Super.* 100, 112, 504 *A.*2d 29 (App.Div.) (recognizing that compliance with or deviation from standard of conduct defined in statute or regulation is "relevant circumstance to be considered" by jury in determining tort liability), *certif. denied,* 104 *N.J.* 383, 517 *A.*2d 391 (1986). However, that ordinance is not determinative, as a matter of law, in insulating a utility company from liability. *See, e.g., Hoyt v. Public Serv. Elec. & Gas Co.,* 117 *N.J.L.* 106, 107, 187 *A.* 43 (E. & A.1936) (finding basis for negligence suit against utility company because even though electric-transmission pole was authorized, "no permit can authorize the construction and maintenance in the highways of a structure dangerous to ordinary travel"); *Adams v. Atlantic City Elec. Co.,* 120 *N.J.L.* 357, 379, 199 *A.* 27 (E. & A.1938) (ruling that "[n]o State Highway Commission permit can authorize the construction and maintenance on the highway of a structure dangerous to ordinary travel"). *See generally* Annotation, *Placement, Maintenance, or Design of Standing Utility Pole as Affecting Private Utility's Liability for Personal Injury Resulting from Vehicle's Collision with Pole Within or Beside Highway,* 51 *A.L.R.*4th 602, 611, 615 (1987 & Supp.1993) (observing that "courts in most jurisdictions have held or recognized that a pole's having been erected pursuant to governmental sanction does not relieve the proprietor from liability or from a charge of negligence otherwise established," and interpreting *Adams* as holding that "the permit was not sufficient to render the placement or maintenance of the pole nonnegligent if that negligence was otherwise established").

Clearly, governmental authorities have the right to determine the location of utility poles. *N.J.S.A.* 48:17–11 (providing that utilities must erect poles in accordance with ordinances and resolutions adopted by local municipalities or boards of freeholders that designate "the location, number and size of the poles" and

that such poles shall be "so placed as not to interfere with the safety or convenience of persons or vehicles traveling on any such street, road or highway"). That governmental involvement in the placement of utility poles relieves utilities of *all* responsibility of reasonable care in the placement of such poles is unclear, however. Nothing suggests that the Legislature intended the relevant statutory scheme to exonerate utility companies of their duty to exercise reasonable care in the placement of utility poles. *Cf. Feldman v. Lederle Labs.*, 97 *N.J.* 429, 446, 479 *A.2d* 374 (1984) (ruling that regulation by Food and Drug Administration of drug industry does not relieve drug manufacturers of duty to provide adequate warnings concerning harmful risks of their products).

I would reverse the trial court's grant of summary judgment for defendants and allow plaintiff to prove her cause of action for negligence.

Justice STEIN joins in this opinion.

*For affirmance*—Justices CLIFFORD, POLLOCK and O'HERN—3.

*For reversal and remandment*—Justices HANDLER and STEIN—2.