42 A.3d 157

JOHN SEALS AND JULIA SEALS, HIS SPOUSE, PLAINTIFF–APPELLANTS AND CROSS–RESPONDENTS, v. COUNTY OF MORRIS, DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TOWNSHIP OF WASHINGTON, STATE OF NEW JERSEY, RAY DRAKE, JACK LANZARO, OFFICER LEONARDI, VERIZON, AT & T, CINGULAR, BELL SYSTEM, BELL TELEPHONE, AND SPRINT, DEFENDANTS, AND JERSEY CENTRAL POWER & LIGHT AND FIRST ENERGY CORPORATION, DEFENDANTS–RESPONDENTS.

JOHN SEALS AND JULIA SEALS, HIS SPOUSE, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. COUNTY OF MORRIS, DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TOWNSHIP OF WASHINGTON, STATE OF NEW JERSEY, RAY DRAKE, JACK LANZARO, OFFICER LEONARDI, VERIZON, AT & T, CINGULAR, BELL SYSTEM, BELL TELEPHONE, AND SPRINT, DEFENDANTS, AND JERSEY CENTRAL POWER & LIGHT AND FIRST ENERGY CORPORATION, DEFENDANTS–RESPONDENTS.

Argued November 9, 2011—Decided May 14, 2012.

*William L. Gold* argued the cause for appellants and cross-respondents John Seals and Julia Seals (*Bendit Weinstock*, attorneys; *Gerald M. Compeau, Jr.*, of counsel).

*Edward J. Buzak*, Special Counsel, argued the cause for appellant and cross-respondent County of Morris (*Mr. Buzak, Daniel W. O'Mullan*, Morris County Counsel, *Robert B. Woodruff*, attorneys; *Mr. Woodruff*, of counsel; *Mr. Woodruff, Gary C. Algeier* and *Kathryn J. Kingree*, on the briefs).

*Ronald A. Berutti* argued the cause for respondents (*Weiner Lesniak*, attorneys; *Mr. Berutti* and *Arnold R. Gerst*, of counsel).

*James B. Ventantonio* submitted a brief on behalf of amicus curiae Verizon New Jersey Inc. (*Ventantonio & Wildenhain*, attorneys).

*Matthew Weng* submitted a brief on behalf of amicus curiae New Jersey State League of Municipalities.

Justice ALBIN delivered the opinion of the Court.

Plaintiff John Seals crashed into an electric utility pole owned by defendant Jersey Central Power & Light (JCP & L) and First Energy Corporation.[1] The pole was located on private property a few feet off a road maintained by defendant Morris County in Washington Township. Plaintiff claims that JCP & L is liable for negligently placing the pole in a dangerous location where it was foreseeable that a vehicle would veer off the road and that the county is liable for its negligence in not having it removed.

JCP & L contends that *Contey v. New Jersey Bell Telephone Co.*, 136 *N.J.* 582, 643 *A.2d* 1005 (1994) confers immunity on a utility company for any injury resulting from the placement of a utility pole off a roadway. In *Contey*, this Court held that a telephone company that placed its pole on property in compliance with the dictates of a municipal ordinance owed no duty to a motorist who collided with the pole. *Id.* at 590–91, 643 *A.2d* 1005. Although no public entity was involved in the *Contey* appeal, the Court further expressed its belief "that responsibility for the

---

[1] First Energy is the parent company of JCP & L. For ease of reference, we refer to both as JCP & L.

safety of motorists should rest with those who own, control, and maintain the thoroughfare." *Id.* at 590, 643 *A.*2d 1005.

Based on its reading of *Contey,* the trial court denied JCP & L's summary-judgment motion, reasoning that because JCP & L did not place its electric pole in a location at the direction of a municipal or county body, it was not immune for its negligent acts. The court also denied the County summary judgment, concluding that a "public entity that does nothing" in the face of the dangerous placement of a utility pole is not necessarily "off the hook."

The Appellate Division likewise relied on *Contey* but reversed, pronouncing that JCP & L could not be found liable because the County and Township gave implicit approval for the pole's location by their silence. *Seals v. Cnty. of Morris,* 417 *N.J.Super.* 74, 88, 8 *A.*3d 796 (App.Div.2010). The Appellate Division additionally concluded that whether the County was immune from suit had not been sufficiently developed before the trial court and therefore remanded for further proceedings. *Id.* at 94–95, 8 *A.*3d 796.

We believe that the Appellate Division has overread the reach of *Contey* and therefore we reverse and remand. First, the statutes governing the placement of telephone poles, *N.J.S.A.* 48:17–8 and 17–11, are different from the one governing electric poles, *N.J.S.A.* 48:7–1. The telephone-pole statute, *N.J.S.A.* 48:17–11, gives the appropriate municipality or county authority to dictate the precise location of such poles; on the other hand, the electric-pole statute, *N.J.S.A.* 48:7–1, does not give a similar power to the "incorporated city or town" where the pole is located. Second, in this case, neither the County nor the Township directed JCP & L where to locate the electric pole. Unlike the utility in *Contey,* JCP & L was solely responsible for the location of its pole. Accordingly, JCP & L is not entitled to immunity under *Contey* for any negligence in the placement of the pole. We therefore vacate the order of summary judgment entered in favor of JCP & L.

Finally, in this case, the liability of a public entity, such as the County, must be judged against the immunity provisions of the

New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3. We can discern only one potential theory on which liability against the County can rest—that the roadway near the location of the JCP & L pole constituted a dangerous condition of property. Plaintiff cannot succeed on this claim unless he satisfies all the elements of *N.J.S.A.* 59:4–2 and further shows that his action is not barred by the plan or design immunity provision of *N.J.S.A.* 59:4–6. Although plaintiff pled as a cause of action a dangerous condition of property under *N.J.S.A.* 59:4–2, before the trial court, he seemingly abandoned this theory due to a plain misreading of the statute. We remand for further development of the record and consideration of these issues.

I.

A.

 This case comes before us based on appeals from defendants' motions for summary judgment.[2] At this procedural juncture, we must view the evidence of record in the light most favorable to plaintiff, the non-moving party. *Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 330, 9 *A.*3d 882 (2010) (noting that appellate court reviewing summary-judgment motion applies same standard governing trial court—viewing evidence in light most favorable to non-moving party); *see also R.* 4:46–2.

On February 7, 2003, at approximately 4:00 a.m., plaintiff John Seals was driving his pickup truck eastbound on County Route 513 in Washington Township, New Jersey. The roadway was covered in several inches of snow. As plaintiff descended a hill at about thirty-five miles per hour, he approached a rightward curve. Due to the slick road conditions and despite applying his brakes, plaintiff could not negotiate the curve and continued on a straight trajectory. Plaintiff's pickup truck skidded straight over the center line and across the westbound lane of traffic, ultimately

---

[2] Plaintiff is not appealing the denial of his summary-judgment motion.

striking JCP & L's Pole # 617 located several feet off the roadway on private property. No guardrail separated the roadway from the pole; no lights illuminated the area; and no sign warned of the impending curve. Plaintiff claims he suffered serious and permanent injuries in the crash.

## B.

In 2005, plaintiff filed a complaint in the Law Division, Morris County, alleging that defendant Morris County negligently maintained a dangerous condition of property—its roadway—and that defendant JCP & L negligently placed and maintained the utility pole at the crash site.[3] Plaintiff further alleged that both defendants were the proximate cause of the accident and his injuries.[4]

Route 513, once an old stagecoach road, is now owned, controlled, and maintained by Morris County. The utility pole designated # 617, on which are strung electric wires, is owned by JCP & L. The pole is located on private property over which the County has a right-of-way. The original Pole # 617 was installed at its approximate present-day location by JCP & L's predecessor sometime in 1937 or earlier. The pole has been replaced three times: in 1976, presumably due to age; in 1998, after a motorist who struck the pole was killed; and in 2003, after plaintiff's truck collided into the pole. There also was an automobile accident involving Pole # 617 in 1989. Other motor vehicle accidents occurred in the immediate vicinity of the pole in 1991, 1996, 1998, and 1999. At least some of the accidents occurred in a similar manner to the one here: a motorist driving eastbound on Route

---

[3] The complaint alleged, in part, that "[a]mong other things, this two-lane roadway, which went downhill and curved to the right, was pitched improperly, lacked a guardrail, had utility poles set too close to the roadway and treed areas bordering the roadway, . . . and was not illuminated."

[4] In the complaint, plaintiff's wife, Julia Seals, asserts a loss-of-consortium claim. Plaintiff also named a number of other defendants, all of whom were later dismissed from the case. Those dismissed defendants are not relevant to this appeal.

513 skidded on wet or icy pavement, was unable to negotiate the curve in the road, crossed over the westbound lane, and slid off the roadway.

JCP & L (or its predecessor) installed Pole # 617 and the other electric poles along Route 513 without seeking approval from, or in any way involving, Morris County. On its own, without conducting any safety study, JCP & L determined exactly where to install its utility poles. According to the deposition testimony of its supervising engineer, Richard Santoro, JCP & L did not take into account the number of accidents occurring at a particular location or maintain a database specifically tracking or recording car-pole accidents. Therefore, it had "no knowledge [if a] pole was in any way a safety problem." The local police did call JCP & L if one of its poles was involved in an accident. Although JCP & L did not "keep accident records per se," following a pole hit, it did maintain records on whether the pole was damaged, whether it had to be replaced, and when it was repaired or replaced.

JCP & L had no written guidelines concerning the safe placement of utility poles. Rather, it approached the task with practical considerations in mind: the need to obtain the property owner's approval and place the pole off the road surface within a reasonable distance to make it accessible for repair work by a company truck. JCP & L, through its supervising engineer, acknowledged that no permit or approval was required from the County before installing a pole. JCP & L, however, would alert the County about work that had to be done on a pole and about the time involved—apparently because the work had to be performed from the roadway.

According to JCP & L, if the pole posed a safety hazard, JCP & L would have moved the pole at the County's request or the County was free to erect a guardrail to protect motorists. JCP & L's engineer stated that even if Pole # 617 had been struck by cars once a year, every year, for ten years, the County—not JCP & L—would be responsible for deciding whether the pole should be moved or a guardrail installed. Absent a particular request by

a governmental entity, JCP & L would not move a pole, regardless of the number of accidents.

Morris County asserts that it has no police force and that an accident on one of its roadways is investigated by the police in the municipality in which the accident occurred. The County did not become aware of accidents on its roadways unless the municipal police force investigating the matter made a report to the County. Although three motor vehicle accidents directly involved Pole # 617 between 1989 and 2003, and four other accidents occurred nearby, the County claims that Washington Township did not notify it of any of those accidents. In other words, the County claims that it was not aware of accidents occurring at or near Pole # 617 before plaintiff's crash.

The County explains, by way of certifications from County Engineer Christopher Vitz and Director of Public Works Stephen W. Hammond, that its nine full-time engineers had neither the time nor the funding to assess the safety of the 7,000 to 8,000 utility poles located along the County's roadways. Moreover, according to Hammond, "utility pole placement/location has been the province of the utility company, and not the County of Morris."

## II.

### A.

Plaintiff Seals, defendant JCP & L, and defendant Morris County all moved for summary judgment. Ultimately, the trial court denied all three motions. The court was not persuaded that *Contey* provided JCP & L with immunity. The court distilled the following from *Contey:* "if a public entity sets the standards, and the utility complies, the utility is off the hook." Because the County did not set any standards for the placement of an electric pole, and was not required to do so by statute, the utility company is "subject to [a] straight negligence standard." On that basis, the court denied summary judgment in favor of JCP & L.

The court declined to find that the County was entitled to immunity under the Tort Claims Act. Although the court rejected the argument that *Contey* imposed a duty on the County to conduct a "safety study," the court nevertheless concluded that the County could not be shielded by the Tort Claims Act because it took "no action" to regulate the location of the electric poles.

The court did not give reasons for denying plaintiff's summary-judgment motion, but was apparently convinced that there were material issues of fact in dispute that had to be decided by a jury.

### B.

The Appellate Division granted the parties' motions for leave to appeal. The appellate panel then (1) reversed the denial of summary judgment for JCP & L; (2) vacated the denial of summary judgment for the County, remanding that matter for further proceedings; and (3) affirmed the denial of summary judgment for plaintiff. *Seals, supra,* 417 *N.J.Super.* at 78, 95, 8 *A.*3d 796.

The panel first concluded that JCP & L was entitled to immunity under our decision in *Contey. Id.* at 84–89, 8 *A.*3d 796. The panel deduced from the language of *Contey* one controlling principle—that "governmental entities [have] the duty to establish standards for the initial placement and *continued existence* of utility poles along the roadways in this State." *Id.* at 87, 8 *A.*3d 796. That principle followed from *Contey*'s reference to *N.J.S.A.* 48:17–11, as "requir[ing] utility companies to erect poles in accordance with ordinances and resolutions adopted by the local municipality or board of freeholders." *Id.* at 86, 8 *A.*3d 796. It also followed from *Contey*'s expressed belief that the " 'responsibility for the safety of motorists should rest with those [public entities that] own, control, and maintain the thoroughfare. . . .' Public bodies may by their ordinances and regulations require the relocation, removal, shielding, or redesign of poles that do not meet safety standards." *Id.* at 87, 8 *A.*3d 796 (quoting *Contey, supra,* 136 *N.J.* at 590, 643 *A.*2d 1005). The panel reasoned that if public

entities had the power to regulate the location of a utility pole through their lawmaking authority, then those entities "in the absence of an ordinance, resolution, regulation, or other governmental action, *implicitly* placed their imprimatur on Pole # 617's location." *Id.* at 88, 8 *A.*3d 796 (emphasis added).

As further support for that conclusion, the panel pointed to *N.J.S.A.* 48:3-17.1, which presumes that a property owner consents to the location of a utility pole on his property if the pole has remained at substantially the same spot for at least ten years. *Ibid.* Utilizing *N.J.S.A.* 48:3-17.1, the panel further reasoned that, given the County's easement over the "property where the pole is located," the County and "Township's silence on the pole's location can only be deemed another example of the governmental entities' implicit approval of the pole's location." *Ibid.* Thus, by the panel's reckoning, the failure of the County to direct or request JCP & L to move the location of the pole conferred immunity on JCP & L for any motor vehicle accident involving the pole. The panel therefore reversed the trial court's "order denying summary judgment to JCP & L both pursuant to *Contey* as well as pursuant to *N.J.S.A.* 48:3-17.1." *Id.* at 89, 8 *A.*3d 796.

In addressing the County's appeal, two members of the panel expressed their belief that *Contey* "did not intend to recognize a novel source of liability against public entities outside of the TCA." *Id.* at 91, 8 *A.*3d 796. The majority noted that "plaintiff's counsel conceded" before the trial court that the County could not be held liable for maintaining a dangerous condition of property because Pole # 617 was not on the County's roadway, *see N.J.S.A.* 59:4-2, or for failure to inspect, *see N.J.S.A.* 59:2-6, or for failure to enact an ordinance regulating the location of the pole, *see N.J.S.A.* 59:2-4. *Ibid.*

The majority then turned to the County's assertion that it was protected by *N.J.S.A.* 59:2-3(c) and (d), which provide immunity when a public entity exercises "discretion in determining whether to seek or . . . provide [certain] resources," *N.J.S.A.* 59:2-3(c), and when it exercises discretion in determining "whether and how to

utilize or apply existing resources" "in the face of competing demands," *N.J.S.A.* 59:2–3(d). *Id.* at 93–94, 8 *A.*3d 796. Based on the record, which included conclusory certifications from the County's engineers, the panel could not find that "the decision to defer responsibility for placing utility poles along county roadways to utility companies was the exercise of discretion subject to immunity under either subsection (c) or (d)" of *N.J.S.A.* 59:2–3. *Id.* at 94, 8 *A.*3d 796. Nevertheless, the panel remanded for further proceedings because the arguments regarding TCA immunity for the County had "not been sufficiently developed." *Id.* at 95, 8 *A.*3d 796. Finally, the panel ·determined that plaintiff's appeal from the denial of summary judgment was wholly without merit. *Id.* at 94, 8 *A.*3d 796.

A separate concurring opinion expressed disagreement with the majority's commentary that *Contey* does not impose "a novel source of liability against public entities outside" the TCA. *Id.* at 95, 8 *A.*3d 796 (Fisher, J.A.D., concurring). The concurrence observed, however, that the scope of the County's "obligation remains uncertain and the TCA may cloak [it with] immunity in these circumstances." *Id.* at 96, 8 *A.*3d 796 (Fisher, J.A.D., concurring). The concurrence agreed with the majority that the record had not been sufficiently developed to grant the County immunity under *N.J.S.A.* 59:2–3. *Ibid.*

Motions for leave to appeal were filed by both plaintiff and the County, and both were granted. *Seals v. Cnty. of Morris,* 205 *N.J.* 269, 15 *A.*3d 18 (2011); *Seals v. Cnty. of Morris,* 205 *N.J.* 270, 15 *A.*3d 18 (2011). We also granted. the motions of New Jersey State League of Municipalities and Verizon New Jersey Inc. to participate as amici curiae.

## III.

The parties and amici invoke differing interpretations of *Contey* to support the positions they advance. Plaintiff contends that *Contey* provided immunity to a utility only if it located a pole "in accordance with the location and design authorized by the public

body." *Contey, supra,* 136 *N.J.* at 591, 643 *A.*2d 1005. According to plaintiff, the Appellate Division improperly relied on a "legal fiction" that the County gave its "implicit imprimatur" to the placement of the pole by giving no directive to JCP & L. That "legal fiction" should not stand, says plaintiff, because it evades the explicit dictates of *Contey* and because JCP & L placed its poles wherever it wanted, without regard to safety, and did not report to the County the accidents involving Pole # 617. Even if the County by its silence delegated the placement of poles to JCP & L, plaintiff submits that JCP & L negligently executed the duty to locate those poles at safe sites. Plaintiff also proffers that no provision of the Tort Claims Act cloaks the County with immunity.

Not surprisingly, the County agrees with plaintiff that the Appellate Division erred by finding that the County's silence on the pole's placement constitutes "implicit approval" for the pole's location. The County asserts that the panel's ruling "shifts the burden of responsibility from the entity that placed the pole" seventy to eighty years ago to the County, which had no involvement in the utility's decision. The County also argues—as did plaintiff—that the panel misapplied *N.J.S.A.* 48:3–17.1, which simply states that the "owner of the soil" cannot seek removal of a pole ten years after its placement. The County observes that *N.J.S.A.* 48:3–17.1 "is not designed to relieve the utility of any liability if the pole was placed negligently," nor does it transfer liability to the public entity. The County claims that, under the panel's holding, it is liable for JCP & L's negligent placement of the pole, even though the County had no statutory power to relocate the pole. Last, the County submits that under no provision of the Tort Claims Act can it be held liable.

Amicus League of Municipalities supports the County's position seeking reversal of the panel's decision. The League posits that telephone and electric poles are governed by different statutes that yield different results and, for that reason, *Contey* "does not apply to issues involving electric companies." Even under the statute that applies to electric poles, the League notes, "the

permission of Morris County is immaterial to the placement of the pole" because only cities and towns are mentioned as having any role in a pole's location.

On the other hand, JCP & L asserts that the Appellate Division properly construed *Contey* and applied *N.J.S.A.* 48:3–17.1. The Appellate Division did not suggest, according to JCP & L, that the County delegated its duty to the utility. The panel only addressed whether the County might be able to assert a discretionary immunity because it "had *deferred* responsibility" concerning the location or removal of the pole.

Amicus Verizon, taking up the cause of the utilities industry, asserts that *Contey* recognized that utilities "are not in the business of roadway design and engineering." Verizon submits that public bodies control every aspect of the safety of the roadways they plan, design, and maintain, and one part of this overall governmental control includes the selection of the location of utility poles. It is Verizon's view that JCP & L has complied with the statute governing electric poles, and "in the absence of any more rigorous requirements enacted by Morris County," JCP & L is entitled to immunity under *Contey.*

## IV.

The first issue before us is whether the Appellate Division, in relying on *Contey* and *N.J.S.A.* 48:3–17.1, erred in granting JCP & L immunity for any negligence in the placement of its electric pole that allegedly was the proximate cause of plaintiff's injuries. The second issue is whether Morris County is answerable for any negligence on its part consistent with the immunity provisions of the Tort Claims Act.

## A.

In *Contey,* the plaintiff, Althea Contey, missed an unmarked S-curve on a roadway and struck a telephone pole standing ten inches off the curb line in the Borough of Franklin Lakes. 136

*N.J.* at 583, 643 *A.*2d 1005. The plaintiff filed a negligence action against the New Jersey Bell Telephone Company, which owned the pole, the Rockland Electric Company, which had permission to place its wires on the pole, and various public entities. *Id.* at 583–84, 643 *A.*2d 1005. She voluntarily settled or dismissed the claims against the public entities. *Id.* at 584, 643 *A.*2d 1005.

Ultimately, the Court affirmed the grant of summary judgment in favor of the two utility companies based on a theory of municipal-conferred immunity. *See id.* at 591, 643 *A.*2d 1005. We first recite the findings of fact and law essential to the Court's conclusion.

In *Contey*, the Court referred to *N.J.S.A.* 48:17–11, which provides that a "utility must erect its poles in accordance with ordinances and resolutions adopted by the local municipality or board of freeholders that designate 'the *location,* number and size of the poles.'" *Id.* at 588, 643 *A.*2d 1005. Although the Court spoke broadly about utilities, significantly, for our purposes, it did not mention that *N.J.S.A.* 48:17–11 only applied to telegraph and telephone companies.[5] Next, the Court noted that the Borough "adopted an ordinance regulating the location of poles." *Id.* at 589, 643 *A.*2d 1005. The ordinance, it appears, refers in particular

---

[5] *N.J.S.A.* 48:17–11 provides:

The governing body of any municipality or the board of freeholders of any county on granting permission to use any street, road or highway for a local line, or on written application to it by any such *telegraph or telephone company desiring to construct any through line,* shall designate by ordinance or resolution the streets, roads or highways in, along, over or under which the poles, wires, conduits and other fixtures shall be erected or constructed and the manner of erecting or constructing the same and the particular location in any street, road or highway where the same shall be placed. They shall be located and constructed according to a plan showing the location, number and size of the poles, conduits and other fixtures to be approved by the governing body or board of freeholders before any work is begun. They shall be so placed as not to interfere with the safety or convenience of persons or vehicles traveling on any such street, road or highway.
[ (Emphasis added).]

to poles of a telephone company, and certainly applied to the defendant New Jersey Bell Telephone. *Ibid.* The Court also expressed its belief "that responsibility for the safety of motorists should rest with those who own, control, and maintain the thoroughfare," and that highway planners, not utility managers, are best equipped to determine the location and design of utility poles. *Id.* at 590, 643 *A.*2d 1005. Finally, the Court concluded that "[w]hen a public utility has located its poles or structures within public rights-of-way in accordance with the location and design authorized by the public body, the utility, in the absence of countermanding directions from the public body, should have no further duty to protect the motoring public." *Id.* at 591, 643 *A.*2d 1005.

The essential holding in *Contey* is that a utility company that is directed by a public body, through an ordinance or a resolution, to place its poles in a particular location should not be held liable for a decision beyond its control. *Contey* did not suggest the converse—that a utility that places a pole in an unsafe manner and location, without any direction or involvement from a public entity, is likewise entitled to immunity. Indeed, such a suggestion would be contrary to the modern trend in our common law, which imposes on every person and entity the duty of acting reasonably and with due care, under the given circumstances, so as not to endanger or cause harm to others. *See Beadling v. Sirotta,* 41 *N.J.* 555, 562, 197 *A.*2d 857 (1964) ("Every [person] is in general bound to use care and skill in his conduct wherever the reasonably prudent person in his shoes would recognize unreasonable risk to others from failure to use such care." (internal quotation marks omitted)). For that reason, under our common law, immunities are disfavored because they insulate parties from the consequences of their own negligence. *See, e.g., Willis v. Dep't of Conservation & Econ. Dev.,* 55 *N.J.* 534, 537–38, 264 *A.*2d 34 (1970) (abrogating common-law sovereign immunity because "[t]here has been a steady movement away from immunity" and "[i]t is plainly unjust to refuse relief to persons injured by the wrongful conduct of the State"); *Collopy v. Newark Eye & Ear*

*Infirmary,* 27 *N.J.* 29, 47–48, 141 *A.*2d 276 (1958) (abrogating common-law charitable immunity because "it runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others ... and disregards modern concepts of justice and fair dealing").

*Contey* contains some broad language regarding the responsibilities of governmental bodies which, if unmoored from the opinion's essential holding, could easily be misconstrued. In viewing that language, we must remember that the public entities were not parties before the Court on appeal. The Court, for example, stated:

> Although utility companies have a duty to foresee that motorists will leave the traveled portion of the highway, the governmental bodies and highway planners are best suited to determine how the utilities should fulfill that duty. Those public bodies are in the best position to provide and to enforce standards and regulations governing utilities. Utilities do not have the right to locate poles wherever they deem expedient. Public bodies *may* by their ordinances and regulations require the relocation, removal, shielding, or redesign of poles that do not meet safety standards.
>
> [*Contey, supra,* 136 *N.J.* at 590, 643 *A.*2d 1005 (emphasis added).]

It may be true that highway planners working for a public body that controls a roadway are "best suited to determine how the utilities should fulfill" their duty. However, that does not mean that a utility company—free of governmental compulsion or direction—can unreasonably and without regard to public safety place its poles in a dangerous location where it is likely to cause injury.

The utility pole in this case is an electric pole, not a telephone pole, and is governed by a statute different from the one applicable in *Contey.*[6] The Legislature has chosen to treat these two types of utility poles in very different ways. The relevant statute in this case, *N.J.S.A.* 48:7–1, provides that poles carrying electricity for electric light, heat, or power "shall [not] be erected in any street of an *incorporated city or town* without first obtain-

---

[6] Whether it makes any sense to have differing statutes regulating electric and telephone poles is a matter for the Legislature, not for this Court.

ing from the incorporated city or town a designation of the street in which the same shall be placed and the manner of placing the same." (Emphasis added). Thus, under *N.J.S.A.* 48:7–1, a power company need only obtain from a city or town—not a county—"a designation of the street" where it intends to place an electric pole and a designation of "the manner of placing the same."

In contrast, under *N.J.S.A.* 48:17–11, a telephone company must submit "a plan showing the location, number and size of the [telephone] poles" to be installed, and the appropriate public entity "shall designate by ordinance or resolution . . . the particular location in any street, road or highway where the [pole] shall be placed." The key difference between the two statutes is that under *N.J.S.A.* 48:17–11, a municipality or county must select the exact location of a telephone pole and approve a pole-layout plan, but under *N.J.S.A.* 48:7–1, an incorporated town or city (but not a county) only designates the street on which an electric pole will be placed. That distinction is critical here because *Contey* construed a telephone-pole statute, not an electric-pole statute. Moreover, the Legislature chose not to include counties as playing any role in the placement of electric poles.

In this case, the County had no authority under *N.J.S.A.* 48:7–1 to designate the exact location of Pole # 617—or even the street generally where the pole is to be located—and in fact the County passed no ordinance or resolution concerning the location of the pole. In addition, Washington Township, which is not a party to this suit, but which does have statutory authority, did not pass an ordinance directing the street location of the pole. JCP & L does not dispute that it, alone, chose the location for the installation of Pole # 617.

Looking at the evidence in the light most favorable to plaintiff on the summary-judgment record before us, JCP & L placed Pole # 617 in an unreasonably dangerous location and knew or should have known of other accidents at the site. Without any compulsion or direction from any governmental authority, JCP & L chose freely the location of its utility pole. We see no reason—and

certainly no legislative purpose—in extending the immunity provided in *Contey* to the circumstances of this case. JCP & L is therefore accountable for any negligence on its part.

In *Stern v. International Railway Co.*, 220 *N.Y.* 284, 115 *N.E.* 759 (1917), then-Judge Cardozo set forth a common-law standard for judging the liability of a utility that erects poles in or near a public roadway. He stated that utility poles "must be so located as to avoid unreasonable and unnecessary danger to travelers upon the highway." *Id.* at 761. He added: "The question is whether the place chosen is so dangerous and the danger so needless that the choice becomes unreasonable. If danger *in that degree* is present, [the company is] charged with liability." *Ibid.* (emphasis added). Under that formulation, a utility company is only required to exercise ordinary—not extraordinary—care to prevent injuries, and is permitted to presume that in the typical manner of operation, vehicles are expected to remain on the roadway. *See Oram v. N.J. Bell Tel. Co.*, 132 *N.J.Super.* 491, 494, 334 *A.*2d 343 (App.Div.1975). In short, a utility is under no obligation to guard against "extraordinary exigencies." *Ibid.*

Utility poles, like trees, dot the edges of our roadways across this State. In the ordinary course, tragedies occur when cars veer off a road, striking a tree or utility pole. Every potential hazard abutting our roads and highways cannot be eliminated; our roadways cannot be made perfectly safe. But that does not mean that certain known and unacceptable risks that pose great danger should not be minimized.

■ One of the purposes of the common-law duty of due care is to encourage parties to take steps that will reduce the likelihood of accidents and consequent lawsuits. *See Hojnowski v. Vans Skate Park*, 187 *N.J.* 323, 335–36, 901 *A.*2d 381 (2006). So long as a utility company—acting without governmental direction—does not place or maintain an electric pole in a spot where there is an "unreasonable and unnecessary danger to travelers upon the highway," *Stern, supra*, 115 *N.E.* at 761, no liability will follow. Needless to say, if the same utility pole is located at a perilous

point on a road and is the site of repeated car-pole accidents, and the pole can be safely and efficiently moved, that may well be evidence of an "unreasonable and unnecessary danger."

We do not question that Morris County, which has responsibility for maintaining public safety on Route 513, has the authority to direct by ordinance or resolution the moving of a utility pole within its right-of-way that poses an immediate hazard to the traveling public. *See N.J.S.A.* 27:16–6 (imposing upon county board of chosen freeholders "duty of maintaining and keeping in repair every [county] road" and conferring "all other duties and all powers respecting such road"); *N.J.S.A.* 27:16–37 (granting county board of chosen freeholders authority to "remove any traffic posts, traffic lights or other obstruction from a public county road when, by resolution, it shall determine such removal to be advisable"). However, the failure to do so is not, as the Appellate Division suggests, an "implicit imprimatur"—a seal of approval—that absolves the utility company from its own negligence. Because a county or municipality is immune for its failure to enact an ordinance, *see N.J.S.A.* 59:2–4, does not mean that a utility is free from the consequences of its negligence. In other words, a government body's failure to act is not an invitation to a utility company to suspend its duty to exercise due care.

Last, we note that from 2005 to 2010, vehicular collisions with utility poles claimed the lives of 5,000 people in this country,[7] including more than 230 lives in this State.[8] It hardly bears mentioning that the safe placement of a pole may be a life-saving measure.

---

[7] *See* Nat'l Hwy. Traffic Safety Admin., *FARS Encyclopedia: Query,* http://www-fars.nhtsa.dot.gov/QueryTool/QuerySection/SelectYear.aspx (last visited April 16, 2012) (select year, "State: All States," "Most Harmful Event: Utility Pole," and "Severity of Injury: Fatal").

[8] *See id.* (select year, "State: New Jersey," "Most Harmful Event: Utility Pole," and "Severity of Injury: Fatal").

In certain instances, it may become readily apparent that a pole is located at a dangerous site. If vehicles repeatedly strike the same pole, it may suggest that the pole poses an unreasonable risk of causing serious bodily injury or death. Under such circumstances, the utility company that placed that pole, in exercising due care, may have a duty to act. To summarize, we conclude that *Contey* does not confer immunity on JCP & L for its negligence, if any, in the placement of Pole # 617.

### B.

■ We also disagree with the Appellate Division that *N.J.S.A.* 48:3–17.1 provides a basis—separate from *Contey*—for the granting of summary judgment in favor of JCP & L. *See Seals, supra,* 417 *N.J.Super.* at 88, 8 *A.*3d 796. *N.J.S.A.* 48:3–17.1 states, in pertinent part, that when a utility company has maintained either an electric or telephone pole

> at substantially the same location or locations for a period of ten years ... such occupancy shall be presumed to be with the consent in writing of *the owner of the soil upon which such pole or poles have been placed,* and no suit, action or proceeding shall lie in any court of this State for the removal of any pole or poles so placed and used.
>
> [ (Emphasis added).]

The Appellate Division acknowledged that "the property on which Pole # 617 is placed is not owned by the County," yet apparently it deemed the County's possession of "an easement over that portion of the property where the pole is located," as the substantial equivalent of ownership for purposes of the statute. *Seals, supra,* 417 *N.J.Super.* at 88, 8 *A.*3d 796. Based on that reading of the statute, the appellate panel concluded that the County's "silence on the pole's location" is yet another example of its "implicit approval of the pole's location." *Ibid.*

■ That interpretation cannot be reconciled with the language of the statute. An easement over property is not the equivalent of the ownership of property. *See Tewksbury Twp. v. Jersey Cent. Power & Light Co.,* 159 *N.J.Super.* 44, 49, 386 *A.*2d 1348 (App.Div. 1978) ("An easement is an interest in land owned by another."),

*aff'd o.b.*, 79 *N.J.* 398, 400 *A.2d* 60 (1979). The statute, by its wording, is obviously intended to settle rights, giving a utility company a permanent easement in property through an analogue to adverse possession. Nowhere in *N.J.S.A.* 48:3–17.1 is there the slightest suggestion that the statute was intended to empower a county, or other public entity, with the authority to order the removal of a utility pole, and that if the governmental authority remained silent, it was giving tacit approval to the location of the pole. We therefore must reject the Appellate Division's interpretation as a misreading of *N.J.S.A.* 48:3–17.1.

## V.

■ We agree with the Appellate Division that the issue of whether the County is entitled to summary judgment based on an immunity provision in the Tort Claims Act must be remanded for further development in the record. We disagree, however, with the Appellate Division on the precise issue that should be the focus of the remand proceeding.

We make the following observations. At approximately 4:00 a.m., plaintiff proceeded down a snow-covered hill on Route 513 in his pickup truck. Plaintiff claims he was unable to negotiate the rightward curve in the road due to the slick surface conditions. Despite applying his brakes, he continued on a straight path across the opposite lane of traffic, striking the pole just off the roadway.

As we see it, the only potential basis for the County's liability is that the roadway curve at the bottom of Route 513 was a dangerous condition of property of which the County was on notice, actual or constructive; that plaintiff's "injury was proximately caused by the dangerous condition"; "that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred"; and that the failure of the County to protect against the condition was "palpably unreasonable." *See N.J.S.A.* 59:4–2. As mentioned earlier, a utility company can presume that vehicles are expected to remain on the roadway. An

electric pole poses an unacceptable hazard to motorists only if there was "a reasonably foreseeable risk" that a vehicle will leave the roadway and strike the pole. Needless to say, if it was not reasonably foreseeable that a vehicle would veer off the roadway, then the pole did not present a danger. In that case, the application of *N.J.S.A.* 59:2–3, which addresses a public entity's immunity for certain discretionary activities—the focal point of the Appellate Division's remand—would not come into play. Plaintiff advanced the theory that the County's "deferral" of moving the pole is not a discretionary activity protected by *N.J.S.A.* 59:2–3. However, that theory is only meaningful if the County created or acquiesced in a danger on its own property. *N.J.S.A.* 59:2–3 cannot be invoked as an end run around *N.J.S.A.* 59:4–2, the statute most closely aligned to the issue in dispute.

■ Plaintiff pled a cause of action under *N.J.S.A.* 59:4–2 in his complaint, which he seemingly abandoned at the summary-judgment hearing in favor of the theory under *N.J.S.A.* 59:2–3. At the hearing, plaintiff's attorney stated that the action was not a "59:4 issue at all," because the County is only "liable for [an accident] caused by a condition on its property." Plaintiff was clearly mistaken when he advised the trial court that *N.J.S.A.* 59:4–2 was inapplicable because the County did not own the pole or because it was not on the County's property. It is enough if plaintiff's injury was "caused by a condition of its property," even if the injury itself occurs off the property. *See N.J.S.A.* 59:4–2. Thus, "when a public entity creates or suffers a dangerous condition on public property that leads ineluctably and foreseeably to injury, it is not insulated from liability under *N.J.S.A.* 59:4–2, even if the ultimate injury takes place off the public site." *Smith v. Fireworks by Girone, Inc.*, 180 *N.J.* 199, 217, 850 *A.*2d 456 (2004). Therefore, the County is not immune from liability for a dangerous condition of its roadway, merely because the accident itself took place on private property.

The possible applicability of *N.J.S.A.* 59:4–2 to the facts of this case presupposes that the County is not entitled to plan or design

immunity under *N.J.S.A.* 59:4–6.[9] According to the 1972 Attorney General's Task Force on Sovereign Immunity, "once [plan or design] immunity attaches no subsequent event or change of conditions shall render a public entity liable on the theory that the existing plan or design of public property constitutes a dangerous condition." Harry A. Margolis & Robert Novack, *Claims against Public Entities,* 1972 Attorney General's Task Force on Sovereign Immunity comment on *N.J.S.A.* 59:4–6 (Gann 2012). Whether Route 513 or any improvements to the road fall within the plan or design immunity of *N.J.S.A.* 59:4–6 is a matter for the remand court to consider.

On the present record, the case before us has much in common with *Luczak v. Township of Evesham,* 311 *N.J.Super.* 103, 709 *A.*2d 305 (App.Div.), *certif. denied,* 156 *N.J.* 407, 719 *A.*2d 639 (1998). *Luczak* involved a wrongful-death action brought against the township for maintaining an allegedly dangerous curved intersection. *Id.* at 105–06, 709 *A.*2d 305. Like Route 513, the road in *Luczak* was an old stagecoach road, which the township later "inherited" and improved through such acts as paving. *Id.* at 106–08, 709 *A.*2d 305. The Appellate Division held that "the trial court improperly directed a verdict in [the township's] favor because [the township] presented no evidence that it or any of its departments or employees approved any plan or design concerning the condition of [the alleged dangerous road] or made any other decision concerning [that road]." *Id.* at 109, 709 *A.*2d 305. The Appellate Division, however, pointed out that on remand the township could seek summary judgment based on *N.J.S.A.* 59:4–6

9 *N.J.S.A.* 59:4–6 provides:

Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

if it could show "prior approval of a specific plan or design addressing the alleged dangerous condition." *Id.* at 112, 709 *A.*2d 305. The Appellate Division also rejected any suggestion that the township had a duty to make design improvements, such as installing guardrails. *Ibid.*

This is not the occasion for us to reach the legal merits of *Luczak*, but that case may help focus the attention of the parties in the remand proceeding. We do not offer an advisory opinion to the trial court on whether the County is shielded—as a matter of law—by an immunity provision of the Tort Claims Act. The trial court must render a decision based on a complete record, addressing the salient facts and difficult legal issues arising under the TCA. On remand, the court also must consider whether plaintiff should be held to his apparent abandonment of his initially pled theory that the roadway constituted a dangerous condition of property under *N.J.S.A.* 59:4-2.

## VI.

For the reasons expressed, we reverse the judgment of the Appellate Division granting summary judgment in favor of JCP & L. We therefore reinstate the action against JCP & L. We remand to the trial court to determine whether, as a matter of law, the County is entitled to immunity under the Tort Claims Act, and for other proceedings consistent with this opinion. We do not retain jurisdiction.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, PATTERSON and Judge WEFING (temporarily assigned)—5.

*Not Participating*—Justice HOENS.